2020 IL App (2d) 170356
Nos. 2-17-0356 & 2-17-0358 cons.
Opinion filed December 31, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 16-CF-210 16-CF-211 |
| DAVID A. NEAL, | ) ) | Honorable Donald J. Tegeler, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    At the conclusion of a bench trial, the circuit court of Kane County found the defendant, David Neal, guilty of two counts of retail theft (720 ILCS 5/16-25(a)(1) (West 2014)) and two counts of burglary (*id.* § 19-1(a)). The defendant was sentenced to 13 years' imprisonment. He now appeals, arguing that the admission, as substantive evidence, of hearsay testimony identifying him as the perpetrator of the burglaries and thefts was plain error and that his sentence was excessive. We affirm.

¶ 2                                  I. BACKGROUND

¶ 3    On February 4, 2016, the defendant was arrested after he attempted to leave a Meijer store in Bloomingdale with packs of men's underwear that he had not paid for. At the time of his arrest, the defendant, a white man, was wearing a green jacket and a flat-brimmed baseball-style cap. He smelled of alcohol.  The defendant was ultimately charged with committing retail theft and burglary by unauthorized entry (entering with intent to commit a theft) on two other dates: December 10, 2015 (No. 16-CF-210), and January 24, 2016 (No. 16-CF-211).  He was alleged to have taken items worth over $300 from the St. Charles Meijer store on each of those occasions. The two cases were consolidated for trial.

¶ 4                          A. Evidence of the Charged Offenses

¶ 5    At trial, the State produced several witnesses, most of whom were Meijer employees.  The first was Vanessa Holmes, a Meijer loss-prevention officer at the St. Charles Meijer store who noticed items missing from the cologne and perfume shelves on December 10, 2015.  When she reviewed the store's surveillance video footage, she saw a white man enter shortly after midnight. He was wearing an olive green jacket, a baseball-style cap with a flat brim, and sunglasses.  The man went to the cologne and perfume aisles and put several bottles into his cart.  He then went to another aisle and placed the bottles into a Meijer bag.  He left the store without paying for the perfume and cologne; as he did so, the lights on the loss-prevention towers by the door lit up. Holmes created a merchandise receipt for the items taken, showing that they had a retail value of $1962.50.  She also created a "be on the lookout" (BOLO) bulletin (admitted as State exhibit 18), using photos of the man taken by a security camera as he left the store.  She emailed the BOLO to other Meijer stores.

¶ 6    Later that day, another Meijer employee, Neal Anthony Guernsey, reviewed the surveillance video footage of the theft and noticed that the suspect actually committed two thefts.

Guernsey counted 13 bottles of cologne initially taken by the suspect. He also noticed that, after the suspect left the store, he put the bags of cologne inside a minivan in the parking lot and drove to a nearby restaurant where he parked. The suspect then came back into the Meijer store, took two white plastic Meijer bags from a register, and went to the perfume aisle, where he took 13 bottles of perfume. He again left the store without paying. Guernsey estimated that the total merchandise stolen during both trips was over $1300. Excerpts of the surveillance video footage showing the suspect's progress through the store were played at trial.

¶ 7    On January 24, 2016, St. Charles Meijer store detective intern Antonio Flores noticed high-end perfumes and colognes missing. In reviewing the store's surveillance video footage, Flores saw a man enter the store shortly after midnight, go to the fragrance aisle, and put various items into a shopping cart. The man left the store without paying for the items, and the towers lit up as he left. Flores believed that the man shown in the surveillance video footage from January 24, 2016, matched the photo of the suspect in a previous BOLO. Flores created a merchandise receipt for the items stolen on January 24, 2016, that totaled $1111.78. Another BOLO using photos from the video footage of this theft was also created (State exhibit 17). The video footage from this date was also played at trial.

¶ 8                              B. Other-Crimes Evidence

¶ 9    In addition to this testimony about the charged offenses, the State introduced evidence regarding other crimes to show intent, *modus operandi*, and identity, among other things.

¶ 10    Matthew Hund, a Meijer detective in the Bloomingdale store, testified that, when he arrived at the store on January 22, 2016, he noticed that the cologne and perfume shelves were "pretty much empty," so he reviewed the surveillance video footage from January 20. He saw a white man wearing a green coat, flat-brimmed baseball cap, and sunglasses enter the store a little after

midnight. The man took handfuls of items off the shelves and put them in a shopping cart. He then wheeled the cart out of the store without paying for the items. Hund estimated that the stolen items were worth about $1500.

¶ 11    On January 27, 2016, Hund once again found the store's cologne and perfume shelves depleted. When he reviewed the surveillance footage, he again saw a white man wearing the same green coat and sunglasses take fragrances from the shelves and put them into a shopping cart. The man also went to the electronics department, where he put other items into his cart. The man then left the store without paying for any of the items. Hund created a BOLO from surveillance photos.

¶ 12    On February 4, 2016, Cynthia Diliberto was working at the Bloomingdale Meijer store. Watching the surveillance camera feed, she saw a man she believed to be the suspect from earlier BOLO alerts in the store. Another employee kept an eye on the man while she went to the parking lot to get license plate information. The police arrived and stopped the man as he was leaving the store. He was wearing a green jacket and a flat-brimmed baseball-style cap. He had bought a bottle of Pepto-Bismol but had not paid for the men's underwear he had concealed in his jacket. The underwear packages fell out of his jacket after the police stopped him.

¶ 13                              C. Identification Evidence

¶ 14    Other than the testimony of the arresting officer, who identified the defendant at trial as the man he arrested on February 4, 2016, two witnesses testified regarding identification: Detective Davie Ketelson of the St. Charles police, and Johnny Pickle, the defendant's stepfather.

¶ 15    Ketelson testified that he was assigned to investigate the December 10, 2015, and January 24, 2016, thefts. On February 5, 2016, after the defendant's arrest for stealing men's underwear, Ketelson spoke with Holmes, who told him that the suspect arrested the day before appeared to be the same person as the man shown in the surveillance video footage from December 10, 2015. On

February 9, 2016, Ketelson took the Meijer BOLO photos (State exhibits 17 and 18) and went to the defendant's last known address, where he spoke with Pickle. He showed Pickle the BOLO photos and asked if Pickle knew who the person in the pictures was. Pickle made a "positive identification."

¶ 16    Pickle then testified. At first, he said he did not know whether Ketelson had shown him pictures. When he was shown State exhibits 17 and 18, Pickle testified that he could not really see them because of vision problems and that they were "just blurry." He then said that he thought that Ketelson did show him some pictures. Asked if he had identified the person in the pictures as the defendant, Pickle said, "I might have. I don't know. I don't remember." Pickle testified that he and the defendant's mother, Sharon Pickle (Sharon), bought the defendant a coat for his birthday a few weeks before Ketelson's visit. He did not recall telling Ketelson that the coat worn by the suspect in the pictures was the same as the one they had bought. He also did not recall telling Ketelson that the defendant often wore hats like the one worn by the suspect.

¶ 17    The State then recalled Ketelson to the stand. He testified that, when he showed Pickle the BOLOs from December 10, 2015, and January 24, 2016, Pickle identified the person in the photos as the defendant. According to Ketelson, Pickle further told him that Pickle had bought the defendant the coat in the photos a few weeks before and that the defendant often wore that kind of hat. Pickle did not say anything about not being able to see well.

¶ 18    The sole defense witness was the defendant's mother, Sharon. She testified that her husband had had poor eyesight in one eye since an accident in his youth, had lost some of the sight in his other eye due to diabetes, and had had cataract surgery on the other eye about a year before trial (the trial took place in January 2017, so that would have been around January 2016). He stopped driving in late 2016 due to poor eyesight. Her husband could not read or write, and she

handled those kind of things for him. The defendant's birthday was January 16, and on that day in 2016 the three of them went shopping. They bought a coat for the defendant at an army surplus store and then went to lunch at the Golden Corral. She identified a credit card statement showing charges at a surplus store and the Golden Corral on January 16, 2016.

¶ 19                                D. The Trial Court's Findings

¶ 20    The trial court found the defendant guilty on all counts. On the issue of identification, it found that the State had proved that the defendant had committed the thefts in question:

> "I find that based upon all of the photographs in question, the fact that there was identification by Mr. Pickle, that in fact the person who committed the events in [these two cases] is one and the same person. That person is Mr. David Neal.
>
> I have looked at the photographs. I have seen Mr. Neal in court, and I have seen the identification of Mr. Pickle in relation to this case, and I find that the identification has been met, and that the people involved were, in fact[—]are in fact Mr. Neal."

The trial court noted that, although there was "no question" that the defendant's parents had bought him a jacket on January 16, 2016, which was after the first charged offense had occurred, there was no evidence that the defendant wore only that jacket or that he could not have been wearing another jacket during the commission of the offenses. The court also commented on the similarity in the appearance of and *modus operandi* of the suspect shown in the videos and described by the Meijer witnesses, which included the clothing worn by the suspect:

> "At all times the person was wearing virtually the same clothing. There was always a hat involved with a wide brim, although the hats were slightly different. They were identified by Mr. Pickle in the one picture as being that of [*sic*] Mr. Neal's possession. The coat was always the same."

Regarding the identity of the suspect, the trial court concluded:

"The *modus operandi* was the same. The intent was the same, and since I have found that Mr. Neal was the same person as identified by Mr. Pickle, and looking at all the pictures, I find as the trier of fact, although it is circumstantial evidence, that all of the pictures involved in this case are in fact Mr. Neal. I find that everything adds up to Mr. Neal committing these thefts. Under the theft statute, I have to find that the Defendant knowingly took possession of the merchandise. I find that the Defendant in this case is Mr. Neal and that he is the person who took merchandise.

* * *

There is no question, I believe, that he is the person involved in these cases."

¶ 21 The defendant moved for a new trial, arguing in part that the State had not proven identity. The trial court denied the motion and ordered a presentence investigation (PSI).

¶ 22 The PSI revealed that the defendant was born in 1968. He reported that he was mentally and physically abused by his step-father (Pickle) throughout his childhood. However, he currently had a positive relationship with his family and they supported him, although they were disappointed in him. He began drinking alcohol at age 11 or 12 and drank excessively since then, never staying sober for more than four or five months. He was removed from his home at age 15, after he was charged with juvenile offenses. Since reaching age 21, he had been convicted of 11 felonies, mostly burglaries or thefts. His most recent conviction before the current charges was for burglary and he had received an 11-year sentence. He had been homeless for three months after his release from that term of imprisonment.

¶ 23 The defendant ascribed many of his problems to his alcoholism. Although he had never received an official diagnosis, he felt that he suffered from depression and anxiety, which caused

"self-destructive behavior," including drinking and committing crimes. He reported that he was often "excessively drunk" when he committed crimes and did not always remember his actions. He had never received substance abuse treatment; he had attended Alcoholics Anonymous (as required by terms of his parole) maybe two times but would just have someone sign his sheet and then leave. He did not have the financial resources to afford any other kind of treatment.

¶ 24    The defendant addressed the trial court at the sentencing hearing. He acknowledged his substantial history of thefts. He said that he had "anxiety, deep depression and alcoholism" but did not have the resources to address these problems, and he argued that another prison sentence would not help him do so. He also said that his mother was dependent on his stepfather, who was increasingly ill, and he hoped to be there for her in case something happened.

¶ 25    Defense counsel requested the minimum sentence of six years. Noting that the defendant qualified for class X sentencing, the State requested a 13-year sentence for the burglaries and concurrent 10-year sentences for the retail thefts.

¶ 26    The trial court found that the only mitigating factor was that the defendant's criminal conduct did not cause or threaten serious harm. It noted his lengthy criminal record. It did not believe that the defendant's alcoholism caused that criminal history, saying that no one had "ever forced the defendant to take a drink of alcohol." Observing that the defendant had been ordered to attend Alcoholics Anonymous meetings as a condition of parole but instead had had someone sign him in without attending, the trial court stated that the defendant was inappropriately blaming others for his own failings. It then sentenced him to two 13-year terms of imprisonment for the burglary convictions and two 5-year terms for the retail thefts, all to run concurrently.

¶ 27    The defendant moved for reconsideration of his sentence and the trial court denied the motion. This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29                    A.  Third-Party Testimony About a Prior Identification

¶ 30    On appeal, the defendant first argues that Ketelson's testimony about Pickle's

identification of the defendant as the person in the BOLO photos was wrongly admitted as

substantive evidence under section 115-12 of the Code of Criminal Procedure of 1963 (Code) (725

ILCS 5/115-12 (West 2016)).  The defendant concedes that he did not object to the admission of

this evidence at trial, but he maintains that its admission was plain error and that his counsel's

failure to object was ineffective assistance of counsel.

¶ 31    Although the admission of evidence is ordinarily a matter within a trial court's discretion,

in this case, the trial court's decision rested on a matter of statutory interpretation, which is a purely

legal matter.  *People v. Lewis*, 223 Ill. 2d 393, 402 (2006).  We therefore review *de novo* the trial

court's determination that the requirements of section 115-12 were met, allowing Ketelson's

testimony about Pickle's identification of the defendant to be admitted as substantive evidence.

*Id.*

¶ 32    Section 115-12 of the Code permits a prior out-of-court identification of a defendant to be

admitted as substantive evidence at trial if the identification was made "after perceiving" the

defendant.  *Id.* at 401; see also Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015) (a statement is not

hearsay if, among other requirements, the statement is "one of identification of a person made after

perceiving the person").[1]  The defendant argues that the phrase "after perceiving him" means "after

_____

        [1] Section 115-12 and Rule 801(d)(1) also require that the declarant testify at trial and be

subject to cross-examination concerning the statement.  725 ILCS 5/115-12 (West 2016); Ill. R.

Evid. 801(d)(1)(B) Oct. 15, 2015.  The defendant does not contest that those conditions were met

perceiving him committing the crime." Thus, the person making the identification must be a victim of or an eyewitness to the commission of the crime, not simply someone who has seen the accused at some point in the past. He argues that the history of the statutory provision, as well as existing case law, shows that the legislature intended to limit the scope of the provision to such persons. The State contends that the statute does not explicitly require that the person making an identification be a victim or an eyewitness and that no such requirement can be read into it. This issue appears to be one of first impression in Illinois.[2]

¶ 33    Prior to the enactment of section 115-12, when a declarant testified and was subject to cross-examination, the declarant's prior statement identifying someone after seeing him or her (usually in a lineup or photo array) was admissible to corroborate the declarant's in-court identification, but it was not admissible as substantive evidence. *People v. Rogers*, 81 Ill. 2d 571, 579 (1980). In response to the supreme court's decision in *Rogers*, the General Assembly enacted section 115-12, which provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies
> at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the

here.

[2] The defendant points out that both when section 115-12 was enacted and now, all of the case law involving the admission of prior out-of-court identification statements involved statements made by an eyewitness to, or victim of, the crime. The fact that past cases have all involved prior identifications by victims or other eyewitnesses is of minimal persuasive force, however, as none of those cases considered the issue of noneyewitness identifications.

statement, and (c) the statement is one of identification of a person made after perceiving

him."  725 ILCS 5/115-12 (West 2016).

See Michael H. Graham, Handbook of Illinois Evidence § 801.13, at 968-69 (2020 ed.) (describing

the 1983 enactment of section 115-12); *People v. Lewis*, 165 Ill. 2d 305, 343 (1995) (noting that

section 115-12 was "born out of" the *Rogers* decision).  Under section 115-12, so long as the

declarant testifies and is subject to cross-examination, the declarant's prior out-of-court

identification of the defendant is admissible as substantive evidence, regardless of whether it

corroborates the declarant's in-court identification of the defendant or is instead introduced "as a

substitute for in-court identification or to bolster a weak one."  Graham, *supra*, § 801.13, at 969.

Several years later, Illinois Rule of Evidence 801(d)(1)(B) was adopted, tracking the language of

section 115-12.  Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015) (in a criminal case, a statement is

not hearsay if the declarant testifies and is subject to cross-examination concerning the statement,

and the statement is "one of identification of a person made after perceiving the person").

¶ 34    The floor debates on Public Act 83-367 (eff. Jan. 1, 1984), the bill creating section 115-12,

do not shed much light on what the legislature intended by the phrase "after perceiving him."  The

sole commentary was a brief explanation by the bill's House sponsor, Representative Johnson, that

the bill "provide[d] standards upon which prior identification of a defendant at a lineup [would be]

rendered admissible in a later trial" and that the bill was necessary because

> "oftentimes [a] year or year and a half or even six months after the offense, it's very
>
> difficult for a person in Court to identify an offending individual.  Whereas, at a much
>
> closer time to the incident, as an example, one or two days, or even hours after the rape or
>
> armed robbery or murder, the offending individual, the defendant, has been identified
>
> validly at a lineup by an individual[.]   [This bill] simply provides that that prior

identification under certain circumstances is rendered admissible in the later trial." 83d Ill. Gen. Assem., House Proceedings, May 17, 1983, at 103-04 (statements of Representative Johnson).

This explanation suggests that, in enacting section 115-12, the legislature was mostly focused on the admissibility of identification statements made by victims or eyewitnesses shortly after the offense. Thus, it reflects that section 115-12 was intended to encompass such identifications. What it does *not* show, however, is any intent to limit the admission of prior identifications to *only* those made by victims and eyewitnesses.

¶ 35    When we construe a statute, our goal is always to determine and give effect to the legislature's intent in enacting the statute. *Lewis*, 223 Ill. 2d at 402. We begin with the plain language of the statute because ordinarily that is the best indicator of the legislature's intent. *Id*. "When statutory language is plain and unambiguous, we must apply the statute as written without resort to aids of statutory construction." *Id*. (citing *People v. Collins*, 214 Ill. 2d 206, 214 (2005)). We will not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions not expressed by the legislature. *Id*.

¶ 36    Here, the plain language of section 115-12 contains no limitation  as to the persons whose prior identifications of a defendant may be admitted into evidence. We will not depart from that plain language by reading into it an exception for identifications made by noneyewitnesses. See *id.* Our approach is consonant with that of other courts that have considered whether to narrow the broad phrasing of section 115-12 by limiting its scope in some fashion. See, *e.g.*, *id.* at 403 (holding that "[t]he statute does not expressly require the declarant to testify on the out-of-court identification before a third party may testify about that identification" and refusing to add such a requirement to the statute); *People v. Thompson*, 2016 IL App (1st) 113648, ¶ 41 (ruling that

section 115-12 does not contain any requirement that the identification take place immediately after the offense and declining to read such a provision into the statute). Thus, the trial court did not err in permitting Ketelson to testify about Pickle's prior identification of the defendant, regardless of whether Pickle "perceived" the defendant during the commission of the crime.

¶ 37    It is, of course, possible that the legislature did not intend to enable the admission, as substantive evidence, of prior identifications that were made weeks after the crime by someone who was not present at the scene. However, if the legislature intended to restrict the scope of section 115-12 in this way, it could have done so. Other state legislatures have restricted their evidentiary rules about prior identifications to encompass only identifications made by victims or eyewitnesses. See, *e.g.*, N.Y. Crim. Proc. Law § 60.25 (McKinney 2017) (limiting testimony about prior identifications to identifications made by witnesses who "observed the person claimed *** to be the defendant either at the time and place of the commission of the offense or upon some other occasion relevant to the case"); Cal. Evid. Code § 1238 (West 2019) (making evidence of prior identifications admissible only when the identification "was made at a time when the crime or other occurrence was fresh in the witness' memory"—thus limiting the rule to eyewitnesses— and once "the witness testifies that he made the identification and that it was a true reflection of his opinion at that time"). Any such restriction is the province of the legislature or the supreme court committee on the rules of evidence, however, not this court.

¶ 38    Here, no one appears to have directly witnessed the thefts, and the sole ability to identify the perpetrator comes from the surveillance video footage and the still photos taken from that footage. Given the proliferation of surveillance cameras in recent times, this scenario may be increasingly common in the future. We will not interpret the statute to bar evidence of prior identifications by noneyewitnesses, absent a clear legislative intent to do so.

¶ 39    The defendant argues that we should follow the lead of a sister state and conclude that section 115-12 was intended to allow only prior identifications by victims and eyewitnesses to the crime.  In *Ibar v. State*, 938 So. 2d 451 (Fla. 2006), the Florida Supreme Court considered this very question and came to the opposite conclusion from the one we reach today.

¶ 40    The facts of *Ibar* are similar in certain respects to those here.  Two men were captured on a home surveillance system committing crimes (beating the homeowner and killing him and two women).  *Id.* at 457-58.  The police created a flyer, using frames from the video footage.  Ibar was arrested for an unrelated crime.  Believing that he matched the image of one of the perpetrators in the flyer, the police began investigating.  *Id.*  Ibar's roommate, who viewed the video footage, identified Ibar and the other perpetrator.  Five other people who were shown the flyer (none of whom were present during the murders) also identified the two men.  *Id.* at 459-60.  At Ibar's trial, however, the roommate could not remember his earlier identification of Ibar, and the other witnesses denied making positive identifications, saying that they had merely told the police that the photos were of Ibar or someone who resembled him.  *Id.*  In an effort to show that these witnesses' prior identifications had been more definite, the prosecution introduced the testimony of the investigators regarding the prior identifications.  The defense did not object to this testimony, which was admitted as substantive evidence under section 90.801(2)(c) of the Florida Evidence Code.  *Id.* (citing Fla. Stat. § 90.801(2)(c) (1999)).

¶ 41    Like section 115-12 in Illinois, Florida's section 90.801(2)(c) provides that "[a] statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is: *** [o]ne of identification of a person made after perceiving the person." Fla. Stat. § 90.801(2)(c) (1999).  On appeal, Ibar argued that this provision

was intended not to permit third-party testimony about prior identifications by noneyewitnesses but to permit only prior identifications by victims of or eyewitnesses to the charged offense.

¶ 42    The Florida Supreme Court agreed, holding that " 'the phrase "identification of a person made after perceiving him" refers to the witness seeing a person after the criminal episode and identifying that person as the offender.' " *Ibar*, 938 So. 2d at 460 (quoting *Stanford v. State*, 576 So. 2d 737 (Fla. Dist. Ct. App. 1991)).  The court offered two explanations for its conclusion. First, it believed that "[t]o extend the rule that far [to noneyewitnesses] would permit countless repetitions by a witness to others, regardless of time and place, of the witnesses' [*sic*] belief as to the guilty party, a result we do not believe intended by the drafters of the rule." *Id.*  Second, it found that limiting the scope of the rule to eyewitnesses and victims would "better serve the ends of justice" because "expand[ing] the rule to allow as substantive evidence an out-of-court identification made by anyone who sees or is shown a picture of the defendant could result in the defendant being convicted through the testimony of persons who have no relationship or connection to the criminal offense." *Id.*at 462.

¶ 43    Nevertheless, the court ultimately affirmed Ibar's conviction because the erroneous admission of the prior-identification evidence did not affect the outcome of the case, due to the substantial amount of other evidence on the issue of identity, including the video footage that was viewed by the jury. *Id.* at 463.  The opinion drew a lengthy partial dissent, which agreed that Ibar's conviction should be affirmed but disagreed with the majority's conclusion about the proper scope of the prior-identification rule.  See *id.* at 476-80 (Wells, J., concurring in part and dissenting in part).

¶ 44    While we can sympathize with the reluctance of the *Ibar* majority to interpret the prior-identification rule broadly to encompass prior identifications by noneyewitnesses, ultimately we

do not find either of the rationales for its decision persuasive. The first concern over possible "endless repetitions" of prior identifications is a valid one: if, upon seeing a picture of someone sought in connection with a crime, *X* told a room full of people, "that's the defendant," it could be unnecessarily cumulative and unduly prejudicial for a court to allow the prosecution to parade everyone in that room onto the witness stand to testify to *X*'s prior identification. Nevertheless, this concern can be avoided through the application of ordinary evidentiary principles permitting the trial court to limit such testimony, regardless of whether it qualifies as relevant and admissible substantive evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011) (trial court may exclude relevant evidence if its probative value is substantially outweighed by, among other things, the "needless presentation of cumulative evidence"). Fears of overly repetitious testimony do not require the complete barring of such testimony, regardless of whether the person who made the prior identification was an eyewitness or not.

¶ 45    The second rationale relied upon by the *Ibar* majority was its concern that a defendant could be convicted solely on the basis of a prior identification by someone who had no relationship to the crime. *Ibar*, 938 So. 2d at 462. However, as pointed out by the partial dissent in *Ibar*, rules of evidence already permit this result. *Id.* at 479 (Wells, J., concurring in part and dissenting in part) ("Florida case law already allows the conviction of defendants through the testimony of persons who can identify the defendant but who have no relationship to the crime").

¶ 46    The same is true in Illinois under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011), which provides that, in evaluating whether a lay witness may testify to an opinion about the identity of a perpetrator, the key factors are not whether the lay witness saw the charged offense take place but whether the testimony is rationally based on the witness's own sensory perceptions and whether it would be helpful to the finder of fact:

"Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *People v. Thompson*, 2016 IL 118667, ¶ 50.

Under Rule 701, a person offering lay testimony need not have been present when the crime occurred. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 76 (lay opinion witness testimony properly admitted to explain the events recorded in video surveillance footage, including the defendant's movements). Rule 701 thus permits the introduction of substantive noneyewitness testimony that may be used to convict an accused.

¶ 47    The defendant argues that Rule 701 does not apply here. That is true: Rule 701 simply permits a noneyewitness to offer testimony about identification if it would be helpful, which, in practice, means that the noneyewitness must be willing and able to provide that testimony at trial. Where, as here, the noneyewitness is either unable or unwilling to testify that he or she identified the defendant, the State cannot use Rule 701 and instead must rely on Rule 801(d) or section 115-12 to get the prior identification into evidence through a third-party's testimony. However, the implication of this distinction is not obvious and the defendant does not expand upon it.

¶ 48    The defendant also argues that the inherent reliability of an eyewitness's or victim's identification of the defendant as the person who committed the crime is not the same as a noneyewitness's lay opinion testimony identifying a person depicted in a photograph or video. The defendant offers no support for this argument, however, and again his conclusion is not obvious to us. The reliability of testimony by someone like Pickle who has decades-long

familiarity with the person he or she identifies in a photo, could well equal the reliability of an identification by an eyewitness to a crime whose sensory perceptions may be affected by factors such as distance, lighting, the duration of the event or the perception, and stress or excitement. Of course, the circumstances of the identification (such as Sharon's testimony about her husband's vision problems) are still relevant to a factfinder's assessment of the weight to be given to that identification.

¶ 49    Rather, if there is a difference in the inherent reliability of lay opinion testimony by a noneyewitness offered under Rule 701 versus evidence of a prior identification by a noneyewitness under Rule 801(d) or section 115-12, we believe that it arises because the testimony about the witness's prior identification is offered by a third party, rather than by the witness, who is unable or unwilling to identify the defendant in court. A factfinder thus must determine not only whether the witness's identification of the defendant has value but also whether the witness actually made the prior identification that the third-party witness says they did. Such conflicts in the evidence are an ordinary feature of trials, however, regardless of whether the testimony is direct or offered by a third party under a hearsay exception, and they are well within the ability of the factfinder to resolve. See *People v. Smith*, 185 Ill. 2d 532, 542 (1999) (the weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the province of the trier of fact); *People v. Collins*, 106 Ill. 2d 237, 261-62 (1985) (the resolution of any conflicts or inconsistencies in the evidence is within the province of the fact finder). Thus, we do not view this distinction as a sufficient reason to bar third-party testimony about noneyewitnesses' prior identifications.

¶ 50    Anticipating that we might find the meaning of "perceive" in section 115-12 and Rule 801(d)(1)(B) to be ambiguous, the parties argue about the significance of the fact that, under a

different provision of Rule 801(d)(1), a prior inconsistent statement can be admitted as substantive evidence only if it is based on the declarant's personal knowledge. See Ill. R. Evid. 801(d)(1)(A)(2) (eff. Oct. 15, 2015); *People v. Simpson*, 2015 IL 116512, ¶ 32 (the declarant must have personal knowledge of the event itself, not merely the defendant's admission regarding the event). However, the statutory interpretive principle of *in pari materia* applies only when the meaning of the statute's language is ambiguous. As we conclude that the plain language of section 115-12 and Rule 801(d)(1)(B) is clear and contains no express condition that the declarant be an eyewitness or victim, we do not reach these arguments.

¶ 51 Because we find that the trial court did not err in admitting Ketelson's testimony about Pickle's prior identification of the defendant under section 115-12, we need not address the defendant's contentions that any such error amounted to plain error or ineffective assistance. *People v. Eppinger*, 2013 IL 114121, ¶ 19 (under the plain-error doctrine, the first step is to determine whether any error occurred); *People v. Perry*, 224 Ill. 2d 312, 342 (2007) (to succeed on a claim of ineffective assistance of counsel, a defendant must show an error by counsel that was so serious that counsel cannot be said to have been functioning as the counsel guaranteed by the sixth amendment).

¶ 52 Indeed, even if we had found the admission of Ketelson's testimony to be error, we would not find it to be plain error. The plain-error doctrine allows a reviewing court to consider unpreserved error when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the

judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Neither prong is met here. On the first prong, like the court in *Ibar*, we would find that the evidence was not close, because the factfinder's ability to view the surveillance video footage and photos and compare them with the defendant in court provided an ample basis on which to conclude that the defendant was the perpetrator shown in that footage and those photos. In addition, in this case, both Holmes and Diliberto testified that they believed that the man in the earlier surveillance footage and the BOLOs was the defendant. Although the trial court here did refer to the testimony about Pickle's prior identification, the record reflects that the trial court relied extensively on its own observations to resolve the issue of identity.[3] The defendant's minimal arguments on the second prong of plain error are similarly unpersuasive. However, we reiterate that we find no error here, plain or otherwise.

¶ 53                                    B. Excessive Sentence

¶ 54     The defendant also asserts in this appeal that his sentence—a total of 13 years' imprisonment—was excessive and that the trial court erred in how it considered his alcoholism.

---

[3] Indeed, it is quite possible that the reason the substantive admissibility of third-party testimony about prior identifications by nonwitnesses has not been addressed by Illinois courts before now is that such evidence is not particularly strong. Just as in this case, the ability of factfinders to judge for themselves whether the person shown in a photo or video is the defendant is likely to be more compelling than a third party's testimony that a noneyewitness identified the defendant as the person in a photo or video, especially where the noneyewitness disputes that identification.

In evaluating this assertion, we owe a great deal of deference to the trial court. "[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant." *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). Thus, we may not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence is an abuse of discretion only if it is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210. We may not substitute our judgment for that of the trial court merely because we might weigh the pertinent factors differently. *Id.* at 209.

¶ 55    In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id.* There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 56    The defendant acknowledges that his sentence is within the statutory sentencing range, but he contends that the trial court's comment that "no one forced" the defendant to drink displays a misunderstanding of alcoholism as a disease of addiction. He also argues that his history of multiple convictions of retail theft and increasingly long sentences of imprisonment make it clear that those long sentences were ineffective at preventing him from relapsing when he was released or deterring him from engaging in criminal conduct. Instead, he argues, he needs treatment in

order to become a productive citizen. He points out that he had worked for a messenger company for two years before his most recent arrest and his employer stated that she would be willing to hire him again, so such rehabilitation was not an impossibility. He also argues that the trial court misunderstood why he had not participated in counseling after his last release, because it did not realize that he was arrested for the instant charges only a few weeks after that release and remained in jail thereafter, without access to such counseling. In light of all these facts, he argues, a prison term of 13 years was unconstitutionally harsh and ignored the possibility of rehabilitation. Instead of giving him two years longer than his last prison term, as the State requested, the trial court should have given him a sentence closer to the minimum (six years). He asks that we reduce his sentence to eight years.

¶ 57    While a sentence of 13 years might be lengthy for the unarmed and nonviolent retail thefts committed here, we cannot say that it was an abuse of discretion. The trial court appropriately took into account not only the defendant's lifelong history of committing retail thefts and burglaries, but also the fact that the crime spree that resulted in his arrest involved multiple thefts over a period of several weeks. The trial court's comment about no one forcing the defendant to drink was a response to what the trial court viewed as the defendant's efforts to avoid taking responsibility for his actions in stealing. As for the defendant's potential for rehabilitation, the trial court stated that it had taken that into consideration but simply did not believe that potential to be great. That conclusion is supported by the record. The defendant's admission in the PSI that he avoided participating in Alcoholics Anonymous meetings despite being ordered to attend eloquently contradicted his stated desire to rehabilitate himself. We see no error in the trial court's sentence.

¶ 58                                    III. CONCLUSION

¶ 59    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 60    Affirmed.

**No. 2-17-0356**

| | |
|---|---|
| **Cite as:** | *People v. Neal*, 2020 IL App (2d) 170356 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, Nos. 16-CF-210, 16-CF-211; the Hon. Donald J. Tegeler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Yasemin Eken, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |