2022 IL App (1st) 172483-U

SIXTH DIVISION
November 23, 2022

No. 1-17-2483

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 5805 |
| | ) | |
| D'ANDRE FULLER, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial counsel was not ineffective for failing to object to the admission of witness's prior statements of identification. Trial court's error in failing to question the jury in accordance with Illinois Supreme Court Rule 431(b) did not prejudice defendant because the evidence presented at trial was not closely balanced.

¶ 2    A jury found defendant, D'Andre Fuller, guilty of first degree murder and the circuit court sentenced him to 60 years' imprisonment. Fuller appeals. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Fuller was charged with the first degree murder of Tyrone Scott, and a jury trial commenced on May 18, 2015. The evidence adduced at trial is summarized as follows.

¶ 5    Timothy Lewis testified that he knew Fuller from the neighborhood as "Pookie." Lewis had been a community representative at the grammar school that Fuller attended. In addition, Lewis was a very good friend of Scott's, whom he knew from the neighborhood.

¶ 6    Lewis has nine drug-related felony convictions and a misdemeanor conviction for retail theft. At the time of trial, Lewis was awaiting trial on a charge of possession of a controlled substance, but he had not been offered a deal in that case in exchange for his testimony in this case. Lewis served in the Navy for four months but previously falsely testified to the grand jury that he served in the Navy for four years and was stationed in the Philippines, San Diego, and Pearl Harbor. Lewis had previously told defense counsel that he worked at Fuller's school as a substitute teacher, not a school community representative. Lewis was an active drug user at the time of the shooting, but he testified that he was not under the influence of drugs on the day of the shooting or at any point when speaking to police or testifying before the grand jury. A stipulation was later entered as to the testimony of Leanne Tyler, a substance abuse counselor who evaluated Lewis pursuant to a court order in an unrelated felony drug case. On June 27, 2015, a little more than a month after trial commenced in this case, Lewis reported to Tyler that he was a daily user of cocaine. Lewis also reported that he had used a bag of heroin daily until around the time of the shooting, when he increased his use from three to four bags of heroin per day.

¶ 7    On November 26, 2012, Lewis was on the corner of South Kildare Avenue and West Van Buren Street in Chicago doing security for drug sales. On direct examination, Lewis stated that Taurean Holmes, Tyrone Scott, and Marcus Harrington were on the corner with him. On cross-examination, Lewis stated that Miguel Gore was also there. Lewis walked three blocks away to a nearby Blue Line train stop to drum up business for the drug sales. As Lewis walked back to the corner of Kildare and Van Buren, he saw Fuller walking 15 feet away. Lewis said, "What's up,

Pook," but Fuller just looked at him and kept walking. Fuller was wearing jeans and a black hoodie tied around his face. Lewis could clearly see Fuller's face, and noticed Fuller's limp. Lewis lost sight of Fuller as the two walked in opposite directions. Five minutes later, as Lewis neared the corner of Kildare and Van Buren, he saw Fuller standing in front of Scott. Scott was standing on the corner of a vacant lot; Lewis was at the south end of that lot and could see across. Lewis was one or two vacant lots away. It was evening, and Lewis could see by the light of the streetlights. Lewis heard Fuller shoot Scott once, then observed Fuller shoot two more times before Lewis ran away. Lewis heard two more shots as he ran. Lewis had testified before the grand jury that he observed all the shots.

¶ 8      On December 11, 2012, Lewis was arrested on an unrelated charge and asked to speak to police about the Scott shooting. On December 12, Lewis discussed the shooting with police and identified Fuller as the shooter in a photo array lineup.

¶ 9      Marcus Harrington testified that he was in custody for failing to appear in this case and had absconded from parole in an unrelated case. Harrington knew Tyrone Scott from the neighborhood and Fuller from grammar school. Harrington knew Fuller by the nicknames of "Pookie" and "Ray Ray."

¶ 10      On November 26, 2012, Harrington was on the corner of Kildare and Van Buren with Scott and Gore selling heroin. Timothy Lewis was not working with them that day; Lewis had bought heroin earlier and left. Harrington was watching his girlfriend's car exit a nearby alley when he heard a shot from his left side. He saw Scott falling forward and Harrington ran away. Harrington heard two or three more shots as he was running. Harrington got into his girlfriend's car and later drove back towards the corner where Scott was shot, but he was not able to get close because emergency services had arrived and blocked off the area by that time.

¶ 11    On December 1, 2012, Harrington met with police officers investigating the shooting. Harrington testified that he told police he never observed the shooter. Police showed Harrington a photo array lineup and told him to identify anyone that he knew. Harrington identified Fuller as someone he knew, not as the shooter.

¶ 12    Harrington met with police and an assistant state's attorney (ASA) on February 25, 2013. Harrington testified that he met with an ASA and gave a video-recorded statement. The State introduced the statement, in which Harrington said that on the evening of November 26, 2012, he was on the corner of Kildare and Van Buren with Scott and Gore selling heroin. Harrington was watching his girlfriend when he heard a gunshot, looked, and saw Scott falling forward. Harrington was 25 to 35 feet away from Scott at that time. Scott was shot five or six times in all. The gunman was wearing a black hoodie and brown pants. The gunman was Black and carried a black handgun. Over defense counsel's objection, the State introduced that part of Harrington's statement identifying Fuller as the shooter. Harrington was able to identify Fuller because he could see part of Fuller's face.

¶ 13    Harrington was next asked about his grand jury testimony. The State introduced portions of Harrington's March 15, 2013, grand jury testimony. Harrington told the grand jury that on the evening of November 26, 2012, he was on the corner of Kildare and Van Buren with Scott and Gore selling heroin. Harrington was watching his girlfriend when he heard a gunshot, looked, and saw Scott falling forward. He saw Scott get shot from behind four or five more times. The gunman was wearing a black hoodie and brown pants and carried a black handgun. The gunman was African American. It was about to get dark, and Harrington was able to see the shooter's face by the light of the streetlights. He again identified Fuller as the gunman.

¶ 14 At no point on direct examination did the State ask Harrington whether, independent of what he told the ASA and grand jury, he saw the shooter.

¶ 15 On cross-examination, Harrington testified that he did not know who the shooter was and that he lied to police, the ASA, and the grand jury about seeing the shooter. The streetlights had not come on yet at the time of the shooting. Harrington was high on ecstasy, marijuana, and alcohol that day. Harrington heard the first shot and jumped because it was loud. After the first shot was fired, Harrington turned in the direction of where the gunman was. He saw a man with a hood tied over his face. He saw a portion of the shooter's face from his mouth to the top of his eyes, but the shooter was not Fuller.

¶ 16 Henrine Courts testified that she was in her home on the evening of November 26, 2012, when she heard two gunshots. She got on the floor and heard two more gunshots. After some time, Courts got up to see if she could see anything. She went outside and saw Scott, who she knew through his mother, lying on the ground. Courts said "Tyrone," and Scott groaned, but he did not move or breathe after that. Courts told other onlookers to call the police.

¶ 17 Frank Kawczyk, a firefighter and paramedic, and three of his partners responded to the scene at 5:08 p.m. Kawczyk saw a man lying on the ground. He rolled the man over to put electrodes on him and check his vital signs, but the man was already dead.

¶ 18 Terrence McKitterick, an evidence technician, responded to the scene at around 5:30 p.m. McKitterick took photo and video of the scene. He also recovered a bullet from the ground underneath Scott's body. McKitterick then went to the medical examiner's office to photograph and fingerprint Scott.

¶ 19 The parties stipulated to the medical examiner's report, which stated that Scott died of multiple gunshot wounds. Five bullets entered Scott's body through his right back, right posterior

shoulder, right posterior thigh, left posterior forearm, and left chest. It was also stipulated that the bullet found in Scott's brain and the bullet found on the ground beneath Scott's body were fired from the same gun.

¶ 20    Detective John Hillman testified that he obtained a video from a police department camera on the corner of Kildare and Van Buren. Two video clips from the camera were published to the jury. The first showed three people standing on the corner near where Scott's body was found a short time later. The second clip showed a person running down Kildare Avenue, and several people approaching Scott's body.

¶ 21    On December 1, 2012, Hillman interviewed Harrington. Harrington did not appear to be under the influence of drugs or alcohol. Hillman testified that Harrington said he observed Fuller shoot Scott, and watched Scott fall to the ground as Fuller continued to fire his gun. Hillman presented Harrington with a photo array lineup, and Harrington identified Fuller as the person who shot Scott.

¶ 22    On December 12, 2012, Hillman interviewed Lewis. Lewis had contacted police to discuss the shooting after being released on bond for an unrelated arrest. Hillman showed Lewis a photo array lineup. Lewis identified Fuller as a person he saw approaching the scene where Scott was killed.

¶ 23    After Fuller was arrested, Hillman re-interviewed Harrington on February 25, 2013. Harrington did not appear to be under the influence of drugs or alcohol. An ASA also met with Harrington that day. Harrington then agreed to record a video statement. Harrington's video statement was published to the jury.

¶ 24    A stipulation was entered that Timothy Lewis had 11 prior convictions and Marcus Harrington had 2 prior convictions.

¶ 25    The jury found Fuller guilty of first degree murder. Defense counsel filed a motion for a new trial. Fuller raised a *pro se* claim of ineffective assistance of counsel, and the trial court ordered that a *Krankel* hearing be held. See *People v. Krankel*, 102 Ill. 2d 181 (1984). Fuller obtained private counsel, and an evidentiary hearing was held. The trial court denied the posttrial motion, finding that defense counsel was not ineffective where her decision not to call a witness was strategic and Fuller's alibi witness was not credible.

¶ 26    Fuller was sentenced to 60 years' imprisonment. This appeal followed.

¶ 27                              II. ANALYSIS

¶ 28    On appeal, Fuller argues that his trial counsel was ineffective. Fuller also argues that the circuit court erred when it failed to question the jury using the instructions required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and seeks plain error review. We address these arguments in turn.

¶ 29            A. Fuller Was Not Deprived of Effective Assistance of Counsel
              Because Harrington's Prior Statements of Identification of Fuller as the
              Shooter Were Admissible as Substantive Evidence Under Section 115-12

¶ 30    Fuller argues that his trial counsel was ineffective for failing to object to the introduction of Harrington's prior identifications of Fuller as the shooter because the State did not establish that Harrington perceived the shooter *before* it introduced his prior statements of identification, making the identification testimony inadmissible for lack of foundation. Fuller further argues that his trial counsel exacerbated this error by establishing the requisite foundation for Harrington's prior statements of identification during cross-examination. The State responds that defense counsel's failure to object to the admission of Harrington's prior identifications of Fuller was not deficient because, as the trial court ruled, Harrington's statements were admissible as prior statements of identification under section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-

12 (West 2014)), and the statute does not require the witness's perception to be established before a prior statement of identification can be introduced as evidence.

¶ 31    "A criminal defendant has a constitutional right to effective assistance of counsel." *People v. Veach,* 2017 IL 120649, ¶ 29 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). We review a claim of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). "To succeed on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense." *People v. Brown*, 2017 IL App (1st) 142877, ¶ 55 (citing *Strickland*, 466 U.S. at 687). In other words, "a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Wood*, 2014 IL App (1st) 121408, ¶ 60.

¶ 32    Fuller argues that under section 115-12, the State was required to establish Harrington's perception of the shooter before introducing Harrington's prior identifying statements. In other words, it was not sufficient for the perception evidence to be offered as part of the prior identifying statements. We disagree.

¶ 33    Section 115-12 provides that "[a] statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12. "[T]he declarant's prior out-of-court identification of the defendant is admissible as substantive evidence, regardless of whether it corroborates the declarant's in-court identification of the defendant or is instead introduced 'as a

substitute for in-court identification or to bolster a weak one.' " *People v. Neal*, 2020 IL App (2d) 170356, ¶ 33 (quoting Michael H. Graham, Handbook of Illinois Evidence § 801.13, at 969 (2020 ed.)). Prior to the enactment of section 115-12, when a declarant testified and was subject to cross-examination, the declarant's prior statement identifying someone after seeing him or her (usually in a lineup or photo array) was admissible to corroborate the declarant's in-court identification, but it was not admissible as substantive evidence. *People v. Rogers*, 81 Ill. 2d 571, 579 (1980).

¶ 34    "When statutory language is plain and unambiguous, we must apply the statute as written without resort to aids of statutory construction." *Lewis*, 223 Ill. 2d at 402. A court may not read in additions or limitations to the statutory language that were not expressed by the legislature. *Id.*

¶ 35    Here, the statute is clear that the declarant must testify at trial and be subject to cross-examination regarding the statement. The statute further requires that the statement be an identification made by the declarant after perceiving the person. Thus, the plain language of the statute suggests that the statement of identification itself will always contain details of the declarant's perception. Regardless, the statute contains no requirements regarding the order of the declarant's testimony at trial. "This court may not add a requirement for the order of the witness' testimony when it is not found in the plain language of the statute." *Id.* at 403 (holding that section 115-12 "does not expressly require the declarant to testify on the out-of-court identification before a third party may testify about that identification.").

¶ 36    Under the statute, the prior statement of identification may be introduced as substantive or corroborative evidence. The statute does not require the declarant to be a victim of or an eyewitness to the commission of the crime. *Neal*, 2020 IL App (2d) 170356, ¶ 36. Nor does the statute require the declarant to testify to the statement of identification before a third party does so. *Lewis*, 223 Ill. 2d at 403.

¶ 37    Because the statute allows varying formulations for the introduction of this kind of prior identification evidence, to require the State to introduce evidence of the declarant's perception of the defendant prior to allowing the introduction of the identification statement would severely restrict the statute's application. Where the legislature did not include this requirement in the statute, we decline to impose such a condition. We therefore find that the statute does not require a witness's perception to be established prior to the introduction of the prior identification statement. Rather, it is sufficient if such perception evidence is introduced as part of the prior statement of identification, as occurred here.

¶ 38    Fuller's reading of section 115-12 is too narrow. When, as here, a prior out-of-court statement of identification is introduced as substantive evidence, the out-of-court statement itself will necessarily supply the details of the declarant's perception and identification. The facts regarding the declarant's perception of the defendant and details of the identification are part of the statement of identification that allow a fact-finder to determine the reliability of the identification itself. These details are not separable from an otherwise admissible statement of identification.

¶ 39    Harrington's testimony at trial met the requirements for admissibility of his prior statements of identification. Harrington testified at trial and was subject to cross-examination concerning his previous statements of identification, and the identifying statements were made after Harrington observed Fuller shoot Scott. Because the requirements for admissibility were met under section 115-12, defense counsel's cross-examination eliciting inconsistencies in Harrington's testimony was not required to establish the admissibility of the prior identifications. Accordingly, we find that defense counsel was not deficient for failing to object to the introduction

of these statements into evidence, nor was defense counsel deficient in cross-examining Harrington.

¶ 40    In sum, we hold that defense counsel was not deficient in failing to object to the introduction of Harrington's prior statements of identification because Harrington was not required to testify to his perception of Fuller as the shooter independently of his prior identification statements for those statements to be admissible under section 115-12. Because Fuller cannot establish deficient performance by his trial counsel, his claim of ineffective assistance fails.

¶ 41        B. The Trial Court's Failure to Ensure Jurors' Understanding of and
             Agreement with the *Zehr* Principles was Plain Error, but a
        New Trial is Not Warranted Because the Evidence Was Not Closely Balanced.

¶ 42    Fuller next argues that this case should be remanded for a new trial because the trial court plainly erred when it failed to question the jury using the instructions required by Rule 431(b). Fuller advances this argument for the first time on appeal.

¶ 43    "To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion." *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 79. A reviewing court may consider an unpreserved error

> "when (1) a clear or obvious error occurred and the evidence is so closely balanced
> that the error alone threatened to tip the scales of justice against the defendant,
> regardless of the seriousness of the error, or (2) a clear or obvious error occurred
> and that error is so serious that it affected the fairness of the defendant's trial and
> challenged the integrity of the judicial process, regardless of the closeness of the
> evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 44    Rule 431(b) requires the trial court to ask potential jurors whether they

> "understand and accept the following principles: (1) that the defendant is presumed
> innocent of the charge(s) against him or her; (2) that before a defendant can be

11

convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."

The rule "mandates a specific question and response process" that must provide each juror with the opportunity to respond. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 45    Here, the trial court asked whether the prospective jurors had a "disagreement or problem" with the Rule 431(b) principles but did not ask whether potential jurors understood and accepted those principles. The State acknowledges this failure to comply with the requirements of Rule 431(b) constitutes error under *People v. Wilmington*, 2013 IL 112938, ¶ 32 (trial court erred in asking only whether prospective jurors "disagreed with" the Rule 431(b) principles, but not whether they understood them.). But the State argues that there are no grounds upon which this unpreserved error may be reviewed by the court.

¶ 46    Fuller does not argue that the trial court's error resulted in a biased jury, meaning the error was so serious that it affected the fundamental fairness of his trial. *Id.* at ¶ 33. Instead, Fuller argues that the evidence was so closely balanced that this error "threatened to tip the scales of justice against [him]." *Piatkowski*, 225 Ill. 2d at 565. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 47    In *Piatkowski*, our supreme court determined that where, as here, the evidence to convict the defendant came solely from the testimony of two witnesses, no physical evidence connected

the defendant to the crime, no inculpatory statements from the defendant were introduced at trial, and where the defendant presented no evidence, we consider the reliability of the witness testimony in determining whether the evidence was closely balanced. 225 Ill. 2d at 567. We evaluate

> "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

¶ 48    Here, we find that the evidence regarding the reliability of the witnesses' identifications was not close. The State presented two witnesses who identified Fuller as the shooter. Although at trial Harrington disavowed his numerous prior statements to police and the grand jury in this case, those prior statements all consistently identified Fuller as the shooter. Lewis identified Fuller as the shooter to police in a photo array, before the grand jury, and again at trial. Harrington, who knew Fuller from grammar school, was able to see part of Fuller's face at the time of the shooting, although he did so from 25 to 35 feet away. Lewis was not able to see the shooter's face at the time of the shooting but recognized him from a distance of one or two vacant lots as Fuller after seeing him earlier in the day. Lewis had known Fuller for a long time. Harrington and Lewis both described Fuller as wearing a hoodie tied around his face. Both witnesses demonstrated consistency in identifying Fuller as the shooter in their statements to police and identifying Fuller as the shooter in photo arrays. Lewis first identified Fuller to police two weeks after the shooting and testified to this identification at trial. Although at trial Harrington denied identifying Fuller as the shooter to police, the evidence showed that Harrington first identified Fuller as the shooter to police in an interview five days after the shooting and consistently identified Fuller as the shooter

on three prior occasions: a video statement to police, in a photo array lineup, and in his testimony to the grand jury. Both Harrington and Lewis testified that they heard Fuller fire five shots, and this testimony was corroborated by the medical examiner's report that five bullets had entered Scott's body.

¶ 49    Fuller argues that certain discrepancies in the witnesses' testimony undermine the reliability of the witness identifications and show the evidence was closely balanced. We disagree. That, for example, Harrington described Fuller as wearing brown pants while Lewis described him as wearing jeans, does not sufficiently undermine the other evidence demonstrating the reliability of the witnesses' multiple identifications of Fuller. Nor do we find that the evidence elicited regarding Lewis's and Harrington's criminal backgrounds and drug use undermines their otherwise consistent testimony as to the identity of the shooter.

¶ 50    Based on the foregoing, we find that the trial court's error did not prejudice Fuller because the evidence presented at trial was not closely balanced. Accordingly, Fuller is not entitled to relief under the plain error doctrine.

¶ 51                                        III. CONCLUSION

¶ 52    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 53    Affirmed.