2025 IL App (1st) 230635-U

No. 1-23-0635

Order filed December 3, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 20 CR 5853 |
| v. | ) | |
| | ) | |
| MAURICE JONES, | ) | Honorable |
| | ) | Nicholas Kantas, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction, where the evidence was sufficient for a rational trier of fact to find defendant guilty of aggravated robbery beyond a reasonable doubt. The trial court did not err when it allowed the detective's testimony that the offender seen in the surveillance video was defendant. Defense counsel did not render ineffective assistance, where defendant is unable to demonstrate prejudice. The State's argument during closing violated the motion *in limine*, but the error was harmless.

¶ 2    Following a jury trial, defendant, Maurice Jones, was convicted of one count of aggravated robbery. He now appeals, raising four issues. First, he asserts the evidence adduced at trial was insufficient to sustain his conviction. Second, Jones contends the trial court erred when it allowed

a detective to identify Jones as the offender in store surveillance footage, where the detective had not viewed the footage prior to his arrest nor did he have any prior contact with Jones. Next, Jones argues he received ineffective assistance of counsel, where trial counsel failed to request Illinois Pattern Jury Instruction, Criminal, No. 3.15B (approved Jan. 26, 2018) ("IPI Criminal No. 3.15B") and failed to renew a request to strike testimony. Finally, Jones claims his conviction should be reversed where the State committed misconduct by violating a motion *in limine* during closing arguments. For the following reasons, we affirm.[1]

¶ 3                                            I. BACKGROUND

¶ 4         On October 25, 2019, an armed man walked into the Family Dollar store at 6540 South Pulaski Road in Chicago (Family Dollar) and, displaying what appeared to the cashier to be the handle of a firearm, demanded money from the register. The cashier, Hector Infante, complied with the man's request and the offender fled the store.

¶ 5         Jones was arrested in May of 2020 in connection with the armed robbery and he was charged with aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2018)). Prior to his jury trial, Jones filed multiple pre-trial motions, including a motion to bar law enforcement officers and civilians from identifying Jones on a surveillance video taken of the robbery, a motion *in limine* requesting the State be barred from arguing that they "welcome" their burden of proof, and a motion to bar admission of surveillance footage obtained from a nearby residence.

¶ 6                                A. Motion to Bar Identification

¶ 7         At the hearing on the motion to bar identification testimony, defense counsel made an oral amendment, limiting the motion to apply only to Chicago Police Detective Adam Siegel's

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

identification of Jones.

¶ 8        Detective Siegel, who works on a vehicular hijacking team, testified that he emailed Detective William Phelan—who was assigned to the instant armed robbery case—on November 2, 2019. Detective Siegel was not initially assigned to the Family Dollar robbery and was assigned to another undisclosed case. His email to Detective Phelan was in response to a "seeking-to-identify" bulletin that Detective Phelan had issued on October 31, 2019. The bulletin included two photographs of the Family Dollar offender—a side profile and an image of the same individual standing near a white GMC vehicle. Detective Siegel informed Detective Phelan that he believed the same man was the offender in both the case he was investigating and Detective Phelan's case. Detective Siegel did not know the name of the offender and based his observations that they were looking at a "mutual offender" solely on the individual's appearance.

¶ 9        In May 2020, Detective Siegel was contacted by Detective Alfredo Vivas of the SOMEX unit.[2] Detective Vivas provided Detective Siegel with the name Maurice Jones as the potential suspect in the case Detective Siegel was investigating.

¶ 10       Detective Siegel first observed the surveillance footage from the October 25, 2019, Family Dollar robbery while on the stand at the hearing to bar identification. Detective Siegel testified that he had no prior contact with Jones before the video was recorded and agreed that the person in the footage was not wearing any disguise. On cross-examination, Detective Siegel clarified that, after he learned Jones was arrested on May 13, 2020, he spoke with Jones at the police station. Detective Siegel interviewed Jones for 36 minutes and had an opportunity to observe Jones's unobstructed face. He also made an in-court identification of Jones.

---

[2]Siegel testified the SOMEX unit investigates social media accounts.

¶ 11 The State then published the October 25, 2019, Family Dollar surveillance videos and Detective Siegel identified the man on the footage as Jones. The court then briefly questioned Detective Siegel, who agreed that his identification was partially based off his May 2020 interview with Jones.

¶ 12 Defense counsel argued that pursuant to the five-factor test created by our supreme court in *People v. Thompson*, 2016 IL 118667, Detective Siegel should not be able to identify Jones in the surveillance footage, since he had no prior familiarity with Jones and was not present during the robbery. Counsel contended that Detective Siegel was no more likely to correctly identify the suspect from the footage than members of a jury.

¶ 13 The trial court refused to bar Detective Siegel's identification testimony, finding that Detective Siegel and Jones were not strangers, as they had previously met and spoke together for half an hour.

¶ 14                                B. Motions *in Limine* and to Bar Surveillance Footage

¶ 15 Defense counsel filed motions *in limine* on July 8, 2022. Counsel requested, *inter alia*, that the State be precluded from:

> "[making] any argument that has the purpose or effect of lessening the importance of the State's burden of proof or implying that reasonable doubt is merely a pro forma or a minor detail, or that, the burden is met in different trials in different courtrooms on a regular basis, or anything to that effect. The State should further be precluded from stating in its opening or closing arguments that it "welcomes" its burden of proof of beyond a reasonable doubt and that it "meets that burden every day in this court." Such commentary improperly bolsters the State's credibility and seems to imply that, since it is able to meet its burden in other cases, it has met its burden in the present case before the jury. The State should not

be permitted to mention its success in other cases because said statements/arguments are highly improper and wholly irrelevant."

¶ 16 On the same day, Jones filed a separate motion to bar surveillance footage obtained from the Family Dollar, arguing that the State failed to list as a potential witness anyone employed as the video technician at the Family Dollar. Further, he argued the State had failed to tender any reports or information that would support the admission of the surveillance footage.

¶ 17 Several days later, Jones filed a motion to bar residential surveillance footage obtained from the 6500 block of South Komensky Avenue, arguing a lack of foundation and authentication. While acknowledging the State could introduce the evidence under the silent witness theory if the proper foundation was laid, the defense noted that the State provided no indication that the footage, retrieved from a civilian, could be properly admitted in accordance with *People v. Taylor*, 2011 IL 110067.

¶ 18 The parties addressed the motions to bar the surveillance footage, with defense counsel noting that the parties had briefly argued the motions before the prior judge. Defense counsel mentioned neither the date of the prior hearing nor whether the previous judge had ruled on either motion. Defense counsel reiterated the arguments made in the earlier motions, and the State countered that their residential footage witness would be able to properly lay the foundation under the silent witness theory and that the complaining witness would be able to lay the proper foundation for the Family Dollar video.

¶ 19 The court noted that the State would be allowed to enter and publish the videos if they were able to lay a sufficient foundation. Upon further questioning, the State specified that Hector Infante would be the witness to establish the proper foundation for the Family Dollar footage and that Kristopher Matyczak would lay the foundation for the residential footage.

¶ 20                                    C. Jury Trial

¶ 21        On October 25, 2019, Infante was working as a cashier at the Family Dollar when he was robbed at gunpoint. Around 11:54 a.m., a man wearing a black sweater, black jeans, and a black Bulls baseball cap—whom Infante identified in court as Jones—entered the store. He approached Infante at a cash register and inquired about the store's cash back policy. Infante informed Jones that he could give cash back, and they continued to converse while Infante helped another customer check out. Once the customer finished his transaction, Jones informed Infante that he was robbing him. Infante observed his manager, Emma Martinez, approaching the register. Infante, who had been trying to open the cash register, stopped when Martinez walked over.

¶ 22        As Martinez walked away, Infante again attempted to open the register. Jones asked if Martinez was calling the police, and Infante assured him she was not. Jones then began to pull a weapon out of his right pocket, exposing the handle and hammer of a black firearm. Infante remained calm, focused on deescalating Jones, and handed over approximately $220. Jones took the cash and quickly exited the Family Dollar. Infante had a clear, unobstructed view of Jones's face during the duration of the robbery.

¶ 23        Following Jones's exit, Infante called the police to report the incident. When officers arrived at the Family Dollar, Infante showed them the surveillance video footage from inside the store. There were several surveillance cameras in operation inside the store (at the entrance, registers, and some aisles) and one camera outside the entrance. All the cameras record continuously and were working properly on the day of the robbery. Infante was able to make a copy of the surveillance footage for the police officers, and he verified the disk he created.

¶ 24        Defense counsel objected to publication of the video, arguing that Infante did not install the surveillance cameras, he had failed to testify how he knew the cameras were working properly,

and he had failed to accurately describe how he preserved the recording. Following brief argument on the issue, the court found that the State had laid a sufficient foundation for the footage. Infante viewed the video clips as they were published and identified the individuals captured on video.

¶ 25    On May 11, 2020, police officers came to the Family Dollar and showed Infante a photographic array. Infante identified a picture of Jones as the man who robbed the store in October 2019.

¶ 26    On cross-examination, Infante clarified that he did not know Jones and had never seen him before the incident. There was nothing unusual about the way Jones entered the store. The interaction was at least a minute long and began calmly. Infante did not hear Jones speak to either the customer in front of him or behind him. Jones had his hands in his pockets, and Infante first observed the firearm after Martinez walked by, when Jones reached in his right pocket for the weapon. After he was able to retrieve the money from his register, Jones grabbed the money from Infante's outstretched hand and fled the scene. Infante observed Jones as he fled through the parking lot but he did not see where Jones ran to nor did he see Jones enter any vehicle. When police officers showed Infante the photographic array, Infante pointed out Jones's picture "pretty much right away…I remembered the face and everything."

¶ 27    Infante agreed that the firearm cannot be seen in the surveillance video and identified three photographic stills taken from the footage—one depicting Jones's right hand resting on the conveyor belt, and two which displayed Jones's hands out of his pockets. However, Infante maintained that he saw the butt/handle of a firearm, while conceding he did not know whether it was a real firearm or if it was loaded. Infante gave the police officers a physical description of the offender but could only remember describing a younger African American male with short black hair and a goatee, standing approximately six feet tall, wearing a black hoodie and jeans. Although

Infante did not provide the offender's eye color or detail any tattoos the offender may have had, he denied that this was due to the quick nature of the offense, instead explaining he was not looking at those attributes.

¶ 28    Emma Martinez, through an interpreter, explained that she was the store manager working with Infante on October 25, 2019. While she was stocking shelves, she observed a male individual that "came in through the wrong way" to the checkout line. The man walked directly to the register where Infante was working. Martinez approached the register to see if Infante needed help. Martinez observed an African American man, whom she did not recognize, wearing black shoes, jeans, a black sweatshirt, and a black hat. The man did not appear to be purchasing any merchandise and had his right hand inside a pocket, but she did not observe a firearm. While she observed his general appearance, she was scared to study the man's face. After she approached the register, she heard the man say, "give me all your fu*** money." She left the area to call the police, and when she returned, the man was no longer at the register. Martinez proceeded to lock the store's doors.

¶ 29    On cross-examination, Martinez recalled speaking with police officers on the day of the robbery but could not recall what they asked her or how she responded. She could not remember if she had told Detective Phelan that she overheard the man say, "give me all your fu*** money."

¶ 30    Kristopher Matyczak lived in a single-family home on the 6500 block of South Komensky Avenue in 2019. In April of 2019, Matyczak had four security cameras installed on the exterior of his residence: one facing 66th Street, one facing Komensky Avenue, one facing his backyard, and the last camera recording the gangway. The cameras connected to a hard drive located in the basement of the residence. The installer provided Matyczak with an instruction book and step-by-step instructions regarding how to operate the security cameras. On October 25, 2019,

Detective Phelan contacted Matyczak and requested any footage recorded from 11 a.m. to 12 p.m. that day on his surveillance system. Matyczak noted that his computer's time stamp was roughly four hours behind the actual time. In reviewing the requested footage from the 66th Street camera, Matyczak observed a white SUV pull up aside his house, before a man exited and walked east toward the Family Dollar.

¶ 31        During a sidebar, defense counsel then renewed its objection to the publication of the recovered surveillance footage, arguing the State had failed to meet the requirements for the silent witness theory. The court sustained the objection and allowed the State's questioning of Matyczak to continue.

¶ 32        A few minutes later in the footage, Matyczak observed the man jog back to his car and drive away. Matyczak downloaded the relevant section of the video footage (7:52 a.m. to 7:55 a.m. on October 25, 2019) and attempted to email it to Detective Phelan. Due to internet complications, he was unable to successfully send the email until four days later. The State then sought to publish the surveillance video and defense counsel renewed its objection to admission. The court sustained the objection. Upon further questioning, Matyczak was unable to recognize the physical CD upon which the footage was stored. The State requested a sidebar, explaining that although Matyczak did not recognize the physical CD, it would like to show him the video on the laptop so he could confirm the authenticity of the video. Defense counsel objected and the court sustained the objection, noting that it did not believe the State could lay the foundation for the CD so that Matyczak could be shown the contents.

¶ 33        Following more questioning, defense counsel again requested a sidebar, where she requested Matyczak's testimony be stricken as irrelevant. The court denied the motion.

¶ 34    Detective Phelan met with Infante and Martinez on October 25, 2019, at the Family Dollar after he was assigned to respond to the armed robbery. He also met with evidence technician Joseph Scumaci, who processed and photographed the scene of the robbery. Detective Phelan canvassed the area for additional surveillance cameras and contacted Matyczak to request surveillance footage. Four days later, Detective Phelan received the requested video from Matyczak via e-mail. The detective inventoried the video by downloading it and transferring it onto an "optical disk" with a unique inventory number. Detective Phelan identified the physical CD, and the State moved to publish the contents.

¶ 35    Defense counsel objected to the admission and publication of the video and the parties held a sidebar. Counsel argued that a proper foundation had not been laid through the silent witness theory, as Detective Phelan had not provided any information regarding the reliability or capability of the cameras, the competency of the operator or the downloading process. The State countered that Matyczak had laid the proper foundation and the detective was merely connecting the video from the email to the physical CD. The court ruled that the foundation was insufficient for the "admissibility and the functioning of the video" and sustained defense counsel's objection.

¶ 36    Upon further questioning, the State again requested a sidebar. The State reiterated that Matyczak had laid an appropriate foundation as to the operation of the surveillance system and the capability of recording. Further, Matyczak testified that he had e-mailed the downloaded surveillance video to Detective Phelan four days after the robbery. The detective then testified he received the surveillance video via e-mail four days after meeting with Matyczak. The State indicated that it could provide the "e-mail itself" as evidence and repeated its belief that proper foundation had been laid. The court responded that there was no "piece to connect the basic

fundamentals of the foundation for the evidence" and cautioned the State not to "go down this road on this video anymore."

¶ 37    Detective Joseph Foley, who was a Chicago police officer on May 13, 2020, testified he was working with his partner, Kenny Rzeszutko, when he arrested Jones, whom he identified in court. At the time of his arrest, Jones was wearing a black Bulls hat with a collared shirt and pants; the hat was inventoried.

¶ 38    Detective Siegel was assigned to the Family Dollar robbery in approximately October 2019. On May 13, 2020, Detective Siegel interviewed Jones, whom he identified in court, at the Area 3 detective division. After Detective Siegel administered Jones his *Miranda* rights, *Miranda v. Arizona*, 384 U.S. 436 (1966), Jones was shown a still photograph from the October 25, 2019, Family Dollar surveillance video. The detective asked Jones if he was the individual in the photograph, and Jones responded affirmatively. Later, Detective Siegel observed the Family Dollar video footage from the robbery; he recognized the individual in the video.

¶ 39    Defense counsel objected and another sidebar was held. The court noted that this objection was subject to the previous motion in *limine* that a prior judge had already ruled on. The State clarified that it intended to show the detective the surveillance footage to obtain a *Thompson* identification. See *Thompson,* 2016 IL 118667.

¶ 40    The State then published the video footage, and Detective Siegel identified the suspect in the video as Jones. On cross-examination, Detective Siegel conceded that (1) he did not generate the photograph from which Jones identified himself, as he did not watch the surveillance video until two years later; and (2) the photograph contained no signature or written acknowledgement that the individual is Jones.

¶ 41　　The parties stipulated that, if Chicago police officer Anthony Martin were called, he would testify that he responded to the Family Dollar on October 25, 2019, and recovered store surveillance footage depicting the robbery. Martin then inventoried the video and would testify the item was in substantially the same condition as when it was recovered. The State then rested and defense counsel moved for a directed verdict; the court denied the motion.

¶ 42　　In discussing jury instructions, defense counsel objected to the State's requested Illinois Pattern Jury Instruction, Criminal, No. 1.02 (approved Dec. 8, 2011) ("IPI Criminal No. 1.02"). Instead, defense counsel proposed the court allow the modified version of IPI Criminal No. 1.02 that she had submitted, which included a second paragraph relating to officer testimony. The State objected to the modified instruction, specifically to a portion of the second paragraph citing an unrelated case, which was remanded due to the State's improper closing arguments that enhanced the credibility of a police officer. The court denied the modified version of IPI Criminal No. 1.02. There were no objections to the other proposed instructions. The jury reconvened and the defense rested its case.

¶ 43　　Following closing arguments, the court instructed the jury. The jury returned a guilty verdict on the count of aggravated robbery. In a posttrial motion for new trial, Jones argued, *inter alia*, that (1) the court improperly denied (a) his motion to suppress the identification made by Infante and (b) his *Thompson* motion; (2) the court improperly allowed Detective Siegel to testify that Jones was the individual on the surveillance footage; (3) he was not proven guilty beyond a reasonable doubt; and (4) the Court erred in overruling defense counsel's objections throughout the trial and during closing. After brief arguments, the court denied the motion.

¶ 44　　At sentencing, the court reviewed Jones's presentencing investigation report and heard arguments in mitigation and aggravation. The State highlighted Jones's pending felony cases, as

well as his ten prior felonies and seven prior misdemeanors. Defense counsel noted that Jones is a life-long resident of Cook County, who lives with his mother and has one seven-year-old child. Prior to his arrest, Jones worked full time and earned sanitation and food handling certificates. Since his arrest, Jones had begun taking subject tests to earn his GED. Defense counsel acknowledged Jones's lengthy criminal history but asked the court to impose the minimum sentence, considering Jones's lack of violent and weapons-related offenses and the fact that Jones did not display the firearm in the instant case. Noting the public nature of the daytime robbery, Jones's extensive criminal background, and the fact that Jones was alleged to be armed, the court sentenced Jones to a term of eight years' imprisonment. This timely appeal followed.

¶ 45                                   II. ANALYSIS

¶ 46        On appeal, Jones argues that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred in allowing Detective Siegel to identify Jones as the offender in the Family Dollar surveillance footage; (3) trial counsel rendered ineffective assistance by failing to (a) request IPI Criminal No. 3.15, and (b) renew the motion to strike Matyczak's testimony; and (4) the State committed prosecutorial misconduct when it told the jury that it "welcomed" its burden, in violation of a motion *in limine*.

¶ 47                          1. Sufficiency of the Evidence

¶ 48        Jones first contends that the evidence was insufficient to sustain his conviction for aggravated robbery, where the sole eyewitness had an insufficient opportunity to view the hooded offender.

¶ 49        When a defendant challenges the sufficiency of the evidence to sustain their conviction, the reviewing court considers " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard " 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id*. (quoting *Jackson*, 443 U.S. at 319). Thus, in our review of the evidence, we neither retry the defendant nor substitute our judgment for that of the trier of fact. *Id*. A criminal conviction will not be reversed " 'unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt.' " *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 50     To prove Jones guilty of aggravated robbery as charged, the State had to establish that he knowingly took property from the person or presence of another by use of force or by threatening the imminent use of force, while indicating verbally or by his actions that he was armed with a firearm. 720 ILCS 5/18-1(b)(1) (West 2018). The State was also required to prove not only that the crime occurred, but also that it was committed by the person charged. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 104.

¶ 51     Jones claims that the State's case hinged upon Infante's testimony that Jones was the armed robber. However, he contends, Infante's identification was inadequate since he had an insufficient opportunity to view the offender during the robbery. We are unpersuaded by Jones's argument that Infante's identification is unreliable.

¶ 52     The United States Supreme Court, in *Neil v. Biggers*, laid out five factors for courts to consider in assessing the reliability of identification testimony. 409 U.S. 188 (1972). These factors aim to protect defendants from the "likelihood of misidentification." *Id*. at 199-200. These factors include: "(i) the opportunity to view the perpetrator during the crime, (ii) the degree of attention, (iii) the accuracy in reporting prior descriptions of the perpetrator, (iv) the level of certainty at the

time of identification, and (v) the length of time between the crime and the identification." *People v. Johnson*, 2024 IL App (1st) 220494, ¶ 30 (citing *Biggers*, 409 U.S. at 199-200). Although the first factor is the most critical, "no individual factor dictates the outcome." *Id*. ¶ 32. Here, after careful review of the record, and taking the evidence in the light most favorable to the State, we conclude that analysis of the *Biggers* factors does not undermine the reliability of Infante's eyewitness identification of Jones.

¶ 53 Looking at the first *Biggers* factor—a witness's opportunity to observe the offender during the offense—Jones claims Infante was incorrect in his perception that the interaction lasted "about two or three minutes." Rather, he states the evidence indicates the confrontation was less than one minute. We find that this first factor weighs in favor of the reliability of Infante's identification. Despite Jones's claims that the interaction occurred too quickly for Infante to observe the offender, Infante testified credibly that he observed a man—wearing a black sweater, black jeans, and a black Bulls baseball cap—enter the Family Dollar. The man approached Infante at the register and the two men conversed while Infante continued to help another customer. Infante testified that he had a clear and unobstructed view of the offender's face during the duration of the robbery. Further, Infante observed the handle and hammer of a black firearm as the offender began to display a weapon.

¶ 54 Contrary to Jones's claims, the video surveillance does not reflect that "the robbery occurred very suddenly and without warning." Instead, the offender began the incident by approaching and speaking with Infante, under the guise that he wanted to know the store's cash back policy. The video's timestamp reflects that the offender entered the store at 11:54:29 a.m. and did not exit the store until 11:57:00 a.m. While the "active" robbery period may have only lasted a total of approximately 53 seconds, the offender was in the store for two and a half

minutes—just as Infante testified to. Moreover, despite Jones's contentions that Infante's inability to describe the offender's eye color is proof that Infante's attention was drawn elsewhere, Infante testified credibly that he had a clear and unobstructed view of the offender's face during the duration of the robbery. This testimony is corroborated by the Family Dollar surveillance footage. Even assuming *arguendo* that Jones was correct that the total interaction lasted less than 60 seconds, that is still plenty of time for a witness to observe an offender. " 'The conditions need not be perfect and the observation need not be prolonged.' " *Mister*, 2016 IL App (4th) 130180-B, ¶ 104 (quoting *People v. Benson*, 266 Ill. App. 3d 994, 1005 (1994)). "An identification may be positive even though the witness viewed the accused for a short period of time, and [t]he sufficiency of the opportunity to observe is for the trier of fact to determine." (Internal quotation marks omitted.) *In re O.F.*, 2020 IL App (1st) 190662, ¶ 29.

¶ 55        As to the second factor—the witness's degree of attention—Infante's testimony reflected that he observed the offender as soon as he entered the store. Notwithstanding the other customer's presence during the beginning of the encounter, Infante testified credibly that he interacted with the offender, answered his questions, and calmed him down after Martinez approached. Jones attempts to discredit Infante's degree of attention by arguing that witnesses may "tend to focus on weapons and not on the faces of the offenders." However, Infante specifically averred that he did not observe a weapon until after Martinez had approached the register and the offender feared that she was contacting the police. Even then, Infante briefly saw the "butt end" of the firearm before the offender concealed it once more within his pocket.

¶ 56        The third *Biggers* factor—the accuracy of the eyewitness's prior descriptions—weighs in favor of finding the identification reliable. Infante first described the offender as an approximately 20 to 25 year old African American male with short black hair, standing roughly six feet to six feet

and two inches tall, with a slightly grown out goatee and wearing a black hooded sweatshirt, with dark jeans, and a Bulls baseball cap. Infante's description of the offender at trial was consistent with this prior description. Jones puts a heavy emphasis on the fact that the offender was wearing a baseball cap and hooded sweatshirt and therefore Infante could not have seen the offender's hairstyle. As noted above, Infante testified that he had a clear view of the offender's face during the entire robbery. Review of the video surveillance supports Infante's testimony, as the offender's face is clearly visible despite his choice of attire (cap and hood).

¶ 57    The fourth *Biggers* factor—the witness's level of certainty—additionally weighs in favor of finding Infante's identification reliable. While Jones relies upon the fact that courts have found a low correlation between a witness's confidence and the accuracy of their identification, the record in the instant case reveals that Infante's level of certainty has never wavered. Infante testified that when the police officers showed him the photographic array months after the robbery, he was able to point out Jones as the offender "pretty much right away…I remembered the face and everything."

¶ 58    The fifth factor—the length of time between the crime and the confrontation—deserves little weight in this case. While Infante's photographic array identification of Jones occurred seven months after the robbery, Infante's testimony revealed that he picked Jones out of the array "pretty much right away." This court has affirmed identifications with a greater time lapse. See *e.g.*, *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification made one year and four months after offense). Consequently, after consideration of all the *Biggers* factors, we are persuaded that a rational juror could accept Infante's identification testimony as reliable.

¶ 59    Jones finally points to the State's lack of proffered physical or forensic evidence connecting him to the offense. Physical evidence is not necessary to support Jones's conviction, where the

jury found Infante's testimony credible. See *People v. Daheya*, 2013 IL App (1st) 122333, ¶ 76. The testimony of a single witness, if positive and credible, is sufficient to support the finding of guilt. *People v. Hill*, 2023 IL App (1st) 150396, ¶ 23 (citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). Moreover, there was surveillance footage of the incident that was published during the trial. The jury viewed this footage and had the opportunity to view Jones in court. Jones's claims that "the video was blurry" is not borne out by the record.[3] Furthermore, testimony adduced at trial reflected that Jones identified himself as the offender in a still photograph retrieved from the surveillance footage.

¶ 60 Infante testified that Jones demanded money from the cash register. After Martinez approached the scene, Jones asked Infante if Martinez was calling the police. Thus, it is clear Jones acted knowingly. Fearing Martinez was reporting him to the police, Jones then exposed the handle and hammer of a black firearm he kept in his pocket. Infante testified clearly and consistently that he observed the firearm in Jones's pocket.

¶ 61 From this evidence, a reasonable factfinder could conclude that Jones indicated—through his actions—that he was armed with a firearm. Once Infante was able to open the cash register, Jones seized the money from Infante's hand and fled the Family Dollar. Thus, viewing the evidence in the light most favorable to the State, we conclude that Jones knowingly took the money from Infante's register by threatening the imminent use of force, while indicating—by his actions—that he was armed with a firearm.

---

[3]In fact, during a pretrial hearing, defense counsel argued that because the video was clear, there was no need to have lay opinion identification testimony regarding it.

¶ 62                                    2. Trial Court Error

¶ 63          Next, Jones claims the trial court erred when it allowed Detective Siegel to identify Jones in store surveillance footage, where the detective had neither viewed the footage prior to Jones's arrest nor had any prior contact with Jones. The State counters that the court properly allowed Detective Siegel's "lay witness identification" of Jones, where the detective had prior knowledge of Jones. Alternatively, the State argues that even assuming *arguendo* the trial court erred, any error was harmless where it did not affect the verdict.

¶ 64          The supreme court in *Thompson*, 2016 IL 118667, addressed the admissibility of lay opinion identification testimony pursuant to Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). The court held that such testimony is admissible if (a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue. *Id.* ¶ 50. The court explained:

> "Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id.*

¶ 65          In determining whether to allow lay opinion identification testimony, the trial court considers the totality of the circumstances, including the following factors: (1) the witness's general familiarity with the defendant; (2) the witness's familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; (3) whether the defendant was disguised in the

recording or changed his or her appearance between the time of the recording and trial; and (4) the clarity of the recording and extent to which the individual is depicted. *Id*. ¶ 51. Where one or more of these factors is present, there is some basis to conclude that the witness is in a superior position to the jury to identify the defendant from the footage in question *Id*. ¶ 49. The absence of any single factor does not render the testimony inadmissible, as the factors are considered in their totality. *Id*. ¶ 51.

¶ 66 The extent of a witness's prior familiarity with the defendant is a matter of weight rather than admissibility. *Id*. ¶ 49. Where the State seeks to introduce a law enforcement officer's lay opinion identification testimony, the court should allow the defendant an opportunity to examine the officer outside the presence of the jury. *Id*. ¶ 59. This precautionary procedure allows the trial court to make an informed decision as to whether the testimony's probative value is substantially outweighed by the danger of unfair prejudice. *Id*. If the probative value is substantially outweighed, the testimony may be excluded. *Id*. ¶ 54.

¶ 67 The decision of whether to allow lay opinion identification testimony is within the discretion of the trial court and will only be disturbed if that discretion is abused. *Id*. ¶ 49. A trial court abuses its discretion only when (1) its decision is arbitrary, fanciful, or unreasonable, or (2) no reasonable person would take the view adopted by the court. *People v. Towns*, 2020 IL App (1st) 171145, ¶ 44.

¶ 68 While Jones argues that Detective Siegel had no prior contact with Jones, the record belies that assertion. Here, the court held a hearing on Detective Siegel's identification testimony prior to trial, as *Thompson* required. Detective Siegel testified that he received a "seeking-to-identify" bulletin from Detective Phelan, that led him to believe they were seeking the same offender. Once Jones was arrested on May 13, 2020, the detective interviewed Jones for 36 minutes and had an

opportunity to observe Jones's unobstructed face. He also made an in-court identification of Jones. Detective Siegel agreed that his identification of Jones in the surveillance footage was based at least partially off his May 2020 interview with Jones. While the detective did not have a familiarity with Jones at the time the recording was made, the absence of this factor is not dispositive. Though Jones was not disguised in the surveillance footage, he was wearing a baseball cap and a hood. Even though the video does at times clearly show the offender's face, the court found that Detective Siegel was familiar with Jones and believed there was some basis for concluding that the witness was more likely to correctly identify Jones from the surveillance recording than the jury. While we may not have made the same ruling, we cannot say that no reasonable person would agree with the court's decision to allow Detective Siegel to give his lay opinion identification testimony.

¶ 69    In further support of his argument, Jones contends that even the court expressly characterized Detective Siegel's testimony as "highly prejudicial." A thorough review of the record does not support this contention. While the trial court called the hearing "highly unusual," it never opined that the proffered testimony was prejudicial.

¶ 70    Jones additionally argues that the lack of limiting instruction, specifically IPI Criminal No. 3.15B, could have caused the jury to give Detective Siegel's "testimony more weight and resolved any doubts it had about Infante's identification against Jones." Indeed, *Thompson* instructs that,

> "to lessen any concerns regarding invading the province of the jury or usurping its function, the circuit court should properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed." 2016 IL 118667, ¶ 59.

¶ 71    Here, the trial court did not instruct the jury with IPI Criminal No. 3.15B at the end of trial, where it was not requested by counsel. However, the court did instruct the jury prior to the presentation of any witnesses, informing them that they:

> "are the Judges of the facts in this case. You and only you will determine which witnesses to believe and how much weight to be given to their testimony. I believe that police officers will testify in this matter. Under the law, the testimony of a police officer is not to be treated any differently than any other witness. That is a police officer's testimony is entitled to no greater weight or lesser weight than any other person's testimony simply because of that person's status as a police officer."

During jury instructions, the court again stressed that only the jurors were "the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them."

¶ 72    However, even assuming *arguendo* that the court did err in admitting Detective Siegel's identification of Jones, we would find any such error was harmless, as it did not affect the verdict. "To establish that any error was harmless, the State must prove beyond a reasonable doubt that the result would have been the same absent the error." *People v. Salamon*, 2022 IL 125722, ¶ 121. When a reviewing court considers if an error is harmless, they "may (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determine whether the improperly admitted evidence is merely cumulative or [duplicative]." *Id*.

¶ 73    Even without the detective's identification, the evidence against Jones was not closely balanced. The jury viewed the surveillance footage from the robbery, had an opportunity to view still images from that footage, observed Jones in court, heard testimony from Infante that Jones was the offender, and heard testimony from Detective Siegel that Jones identified himself in the

still photograph taken from the Family Dollar footage. Based on the record before us, no reasonable probability exists that the jury would have acquitted Jones absent Detective Siegel's surveillance footage identification.

¶ 74                                    3. Ineffective Assistance of Trial Counsel

¶ 75        Jones next argues that he received ineffective assistance of trial counsel when counsel failed to (a) request IPI Criminal No. 3.15B and (b) renew her motion to strike Matyczak's testimony.

¶ 76        Ineffective assistance of counsel claims are resolved pursuant to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance, a defendant must establish both "that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23. Specifically, a defendant must show that "counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). If a defendant cannot establish prejudice, their ineffective assistance claim necessarily fails. See *People v. Cherry*, 2016 IL 118728, ¶ 31 (failure to establish either prong precludes a finding of ineffectiveness). A reviewing court must be highly deferential in its scrutiny of counsel's performance. *Strickland*, 466 U.S. at 689.

¶ 77        As the Supreme Court noted in *Strickland*,

            "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'." *Id.*

¶ 78    A reviewing court need not address both prongs of the *Strickland* inquiry if the defendant makes an insufficient showing as to one prong. *Id.* at 697. When a defendant challenges a conviction, "the question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *People v. Johnson*, 2021 IL 126291, ¶ 54.

¶ 79    In reviewing claims of ineffective assistance, appellate courts "use a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim." *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). In this case, where Jones's challenge does not involve findings of fact made by the trial court, we consider *de novo* whether Jones has stated a claim for ineffective assistance of counsel. See *People v. Ortega*, 2020 IL App (1st) 162516, ¶ 24.

¶ 80                              A. Jury Instruction

¶ 81    Jones contends that he received ineffective assistance through "incomplete performance," where counsel failed to request IPI Criminal No. 3.15B. He asserts that no reasonable trial strategy existed for counsel's failure and that he was prejudiced, where the evidence was close and the trial court would have given the instruction if requested.

¶ 82    Jury instructions are essential to "provide the jury with the legal principles applicable to the evidence presented so that it may reach a correct verdict." *People v. Smith*, 2025 IL App (1st) 220116, ¶ 34. In Illinois, it is well settled that trial counsel's choice of jury instructions is a matter

of trial strategy. *Id.* "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence, and therefore, are generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *Id.* (quoting *People v. Enis*, 194 Ill. 2d 361, 378 (2000)). The failure to request a particular jury instruction, however, may be grounds for finding ineffective assistance if the instruction was so critical to the defense that its omission " 'den[ied] the right of the accused to a fair trial.' " *Id.* (quoting *People v. Johnson*, 385 Ill. App. 3d 585, 599 (2008)). Jury "[i]nstructions should not be viewed in isolation, but should be considered as a whole," to "determine whether they fairly, fully, and comprehensively informed the jury of the relevant law." (Internal quotation marks omitted.) *People v. Ford*, 2022 IL App (1st) 172581, ¶ 51.

¶ 83 IPI Criminal No. 3.15B states:

"You have before you evidence that a law enforcement officer made an identification of [(the defendant) (an individual) (an object)] from a [(video recording) (photograph)]. It is for you to determine what weight, if any, should be given to that evidence. In determining the weight to be given to this evidence, you should not draw any inference from the fact that the witness is a law enforcement officer."

Further, the IPI Criminal No. 3.15B committee note indicates that the instruction should be given "when a law enforcement officer provides identification testimony regarding a video recording or photograph and the evidence includes that the witness is a law enforcement officer."

¶ 84 Here, the record indicates that trial counsel did not request IPI Criminal No. 3.15B at the jury instruction conference. Jones highlights that defense counsel noted, after the *Thompson* hearing, that the court should give IPI Criminal No. 3.15B considering the court's ruling allowing Detective Siegel's identification. The trial court informed defense counsel that any jury

instructions would be dealt with later. Despite counsel's statement at the hearing, however, she did not request the instruction during trial.

¶ 85    However, defense counsel did request a modified version of IPI Criminal No. 1.02. While there is no copy of the submitted modified IPI in the record, during the discussion on jury instructions, defense counsel noted they were objecting to the State's proffered IPI Criminal No. 1.02 where they "had submitted a modified 1.02 that included a second paragraph, specifically in relation to officer testimony." The State objected and the court declined to give the requested modified instruction, noting, "[t]hat's not going to be admitted. In the event something changes during arguments that would have highlighted any one officer's testimony in particular to any other witness, that being a civilian or some other officer, we can revisit this, but it's denied as of now."

¶ 86    Ultimately, the issue was not revisited. As noted above, however, the court did instruct the jury prior to the presentation of any witnesses, informing them that they:

> "are the Judges of the facts in this case. You and only you will determine which witnesses to believe and how much weight to be given to their testimony. I believe that police officers will testify in this matter. Under the law, the testimony of a police officer is not to be treated any differently than any other witness. That is a police officer's testimony is entitled to no greater weight or lesser weight than any other person's testimony simply because of that person's status as a police officer."

¶ 87    Under these circumstances, we fail to see how the counsel's choice not to request IPI Criminal No. 3.15B denied Jones a fair trial. Jones argues he has demonstrated prejudice where "the evidence that Jones was the offender was close." In support of this claim, Jones relies upon his argument that Infante's identification of Jones was improper.

¶ 88     Contrary to Jones's assertions and as aforementioned, the evidence at trial was not close and there is not a reasonable probability that the outcome would have been different if the jury had been reminded at the close of trial that Detective Siegel's testimony was entitled to the same weight as Infante's testimony.

¶ 89     "When the evidence at trial is 'overwhelming,' a reviewing court will not be 'persuaded that it is reasonably probable that a jury would have acquitted [the] defendant even in the absence' of counsel's alleged errors." *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 96 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 87). Where there is overwhelming evidence of a defendant's guilt, " '[t]he reasonably probable impact of counsel's alleged error is not sufficient to undermine our confidence in the outcome of the trial' and, thus, not sufficient to establish the prejudice prong of the *Strickland* test." *Id*. (quoting *Patterson*, 2014 IL 115102, ¶ 87).

¶ 90     Here, the jury viewed the surveillance video for themselves and were able to compare their observations with Jones in the courtroom. Furthermore, the jury heard testimony that Jones identified himself as the individual in the still photograph taken from the Family Dollar surveillance video. In any event, at the beginning of trial, the court gave the jury a proper instruction on how to evaluate the testimony of a police officer. See *People v. Simms*, 192 Ill. 2d 348, 396 (2000) (noting that the court's admonishment generally cures any prejudice resulting from improper remarks).

¶ 91     For the foregoing reasons, we are not persuaded that counsel provided constitutionally deficient assistance. Where Jones is unable to satisfy the prejudice prong of the *Strickland* test, his claim necessarily fails. See *Johnson*, 2021 IL 126291, ¶ 55 (noting that "*Strickland* requires a defendant to 'affirmatively prove' that prejudice resulted from counsel's errors.")

¶ 92                                    B. Matyczak's Testimony

¶ 93        Jones next alleges he received ineffective assistance when his trial counsel failed to renew her motion to strike Matyczak's testimony.

¶ 94        "[W]hether to move to strike [testimony] is a matter of trial strategy." *Gunn*, 2020 IL App (1st) 170542, ¶ 118. And "matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Id*. ¶ 117. "The dynamic circumstances of trial with which trial counsel are frequently confronted—and the instantaneous response to these circumstances counsel is often required to make—serve to inform the strong presumption that a defense counsel's trial conduct was the product of sound trial strategy." *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 118.

¶ 95        Counsel's motion *in limine* sought to bar the admission of Matyczak's residential surveillance footage. After that motion was denied, counsel then requested that Matyczak's testimony be stricken as irrelevant during a sidebar that occurred while Matyczak was on the witness stand. The court denied counsel's motion to strike but sustained counsel's objection to the State publishing the video footage through Matyczak.

¶ 96        Counsel again relied upon Matyczak's inability to lay a sufficient foundation for the video surveillance during a sidebar held while Detective Phelan was on the stand. The court agreed with defense counsel regarding Matyczak's inability to lay a proper foundation and subsequently sustained counsel's objection to the State publishing the video footage through Detective Phelan. Counsel may have weighed the possibility that relitigating the same issue and attacking Matyczak's testimony may have opened the door for the State to again attempt to admit the security footage.

¶ 97        Considering the State's offer of proof during the sidebar, it is arguable that the State could in fact have established the proper foundation for the admission of the video footage from

Matyczak's security cameras. As is, counsel's choice not to request for the third time that Matyczak's testimony be stricken reflects that counsel was aware that Matyczak's testimony was inconsequential and was not damaging to Jones in any way. Moreover, counsel was successful in achieving her goal of barring admission of Matyczak's video footage. Furthermore, there is no evidence that suggests that if defense counsel had renewed her objection to Matyczak's testimony, the trial court would have granted the motion to strike.

¶ 98        Accordingly, we find Jones has failed to rebut the strong presumption that his counsel's conduct was the product of sound trial strategy. A defendant must meet both prongs of *Strickland* to succeed in a claim of ineffective assistance and, since Jones has failed to meet the first prong, we need not examine the second. See *e.g.*, *Ford*, 2022 IL App (1st) 172581, ¶ 53.

¶ 99                                        4. Prosecutorial Misconduct

¶ 100       Finally, Jones claims that he was deprived of a fair trial when the State committed misconduct by telling the jury during closing argument that it "welcomed" its burden. He contends this was in violation of an agreed upon motion *in limine*. The State counters that Jones has forfeited this issue for review where defense counsel failed to make a contemporaneous objection at trial to the State's comments, counsel failed to include the claim in Jones's posttrial motion, and plain error does not apply.

¶ 101       Here, Jones admits that defense counsel did not object contemporaneously to the prosecutor's remarks. However, he cites the supreme court case of *People v. Denson* in support of his claim that the issue is not forfeited, where counsel filed a motion *in limine* and raised the violation in a posttrial motion. 2014 IL 116231, ¶¶ 11-13. In *Denson*, the court unequivocally stated that in criminal cases, the "court has held consistently that, to preserve an issue for review, a defendant must raise it in *either* a motion *in limine* or an objection at trial, *and* in a posttrial

motion." (Emphases in original.) *Id.* ¶ 18. The State does not argue that Jones failed to object to the offending statements by way of a motion *in limine*. Rather, the State argues that Jones's claim in his posttrial motion was insufficient where Jones failed to allege that the State violated the motion *in limine*. We find this argument disingenuous, where Jones clearly preserved the issue in his posttrial motion when he claimed that:

"The Court erred in denying the defense's objections throughout the State's initial closing argument, especially since ASA Kelly violated defense's motion *in limine* ¶ 9, when she argued that it [the State] 'welcomed' its burden of proof. A clear violation of the motion *in limine* it agreed to abide by during the trial."

As Jones objected to the admissibility of the contested statement both in his motion *in limine* and in his posttrial motion, Jones preserved the issue for review, and "a contemporaneous trial objection was not also required." *Id.* ¶ 24. We now examine whether Jones was deprived of a fair trial due to the State's comment.

¶ 102    "Every defendant has the right to a trial free from improper prejudicial comments or arguments by the prosecutor." *Simms*, 192 Ill. 2d at 396. Prosecutors are afforded wide latitude when presenting their closing argument. *Id.* For a prosecutorial comment in closing argument to be reversible error, the comment must be both improper and substantially prejudicial. *People v. Williams*, 2022 IL 126918, ¶ 49. A prosecutor "may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *Id.*, ¶ 44. Prosecutors may also comment on matters implicated by defense counsel. *Id.* We consider the comments in closing argument in context of the entire closing argument of both the State and defendant. *People v. Ceja*, 204 Ill. 2d 332, 357 (2003). Since "the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks made, the regulation of

the substance and style of the argument is within the trial court's discretion." *Simms*, 192 Ill. 2d at 396.

¶ 103    Here, defense's motion *in limine* precluded the State, in relevant part, from making

"any argument that has the purpose or effect of lessening the importance of the State's burden of proof or implying that reasonable doubt is merely a *pro forma* or a minor detail ***. The State should further be precluded from stating in its opening or closing arguments that it 'welcomes' its burden of proof of beyond a reasonable doubt and that it 'meets that burden every day in this court.' "

The motion *in limine* went on to explain that the reasoning behind the preclusion was that

"[s]uch commentary improperly bolsters the State's credibility and seems to imply that, since it is able to meet its burden in other cases, it has met its burden in the present case before the jury, The State should not be permitted to mention its success in other cases because said statements/arguments are highly improper and wholly irrelevant."

¶ 104    Jones argues the State violated this motion when, in its closing argument, the State noted:

"So in order to sustain that charge of aggravated robbery, the State had to prove a number of propositions. We hold the burden of proof in this case, the highest burden in the legal system and we welcome it. And we've met that burden of proof. So let's take a look at the propositions that we have to prove to you.

To sustain the charge of aggravated robbery, the State must prove the following propositions: ***."

¶ 105    Jones is unable to demonstrate that the State's remarks constituted reversible error. While it is clear the State's comment during closing arguments violated the motion *in limine*, it is equally apparent that—taken as a whole—the State's comment did not violate the purpose behind the

motion. In counsel's own words, the purpose of the motion was to prevent the State from lessening the importance of its burden, bolstering its credibility, or implying that reasonable doubt is a minor detail. When the State's closing argument is looked at comprehensively, it becomes obvious that the State did not attempt to lessen its burden or imply that reasonable doubt is a minor detail. Instead, the State sought to explain that it understood the heavy burden it faced. Furthermore, the prosecutor's statement was an accurate and reasonable reflection of the law—the State does have the highest burden, beyond a reasonable doubt.

¶ 106       In rebuttal, defense counsel repeatedly reminded the jury that "the State has a burden of proof," and insisted the jury "[h]old the State to their burden." This argument served to reinforce the State's burden of proof in proving Jones guilty. Moreover, the court gave the jury proper instructions on the State's burden of proof. See *Simms*, 192 Ill. 2d at 396 (noting that a trial court's admonishments on the law to be applied generally cures any prejudice resulting from improper remarks). When instructing the jury, the trial court highlighted that the "State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

¶ 107       Considering the above, we find that Jones has failed to establish that any prejudice, yet alone substantial prejudice, resulted from the State's remarks. The challenged remark was factually accurate and did not obfuscate the purpose behind defense's motion *in limine*. Further, the remark was cured by the trial court's proper jury instructions on the law to be applied.

¶ 108                                III. CONCLUSION

¶ 109       Based on the foregoing reasons, Jones's conviction is affirmed.

¶ 110       Affirmed.