NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250731-U

NO. 4-25-0731

IN THE APPELLATE COURT

FILED
June 17, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DABRONA ALZEBDIEH, | ) | No. 24CM602 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Amy L. McFarland, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's retail theft conviction where the evidence was sufficient to support her conviction and the court did not err in allowing witnesses to identify defendant at trial.

¶ 2    Following a jury trial, defendant, Dabrona Alzebdieh, was found guilty of retail theft (720 ILCS 5/16-25(a)(1) (West 2024)). The trial court sentenced defendant to 18 months of conditional discharge and ordered her to pay restitution. On appeal, defendant contends that (1) the State did not prove her guilty beyond a reasonable doubt and (2) the court erred in allowing two witnesses to identify her from surveillance footage. We affirm.

¶ 3                          I. BACKGROUND

¶ 4    On July 15, 2024, defendant was charged by information with retail theft (720 ILCS 5/16-25(a)(1) (West 2024)) for stealing merchandise from Meijer in Normal, Illinois. Defendant's jury trial took place on May 14, 2025.

¶ 5                                A. Tyler Monteer

¶ 6            The State's first witness was Tyler Monteer. He testified that he works at Meijer in Normal as an "asset protection team leader." He has worked in that role for approximately two and a half years. One of his main duties is to prevent customers from stealing from the store.

¶ 7            Meijer has a video security system, with which Monteer is familiar. He was trained how to operate the software and cameras in the store and export footage from them. The cameras are located both inside and outside the store, with most "on the sales floor." The system is always on and saves the information "to a cloud storage system." Monteer testified that he uses Meijer's video surveillance system on a daily basis.

¶ 8            Monteer testified that a "last point of sale" is "the final point in the store where you can actually purchase products." He described the "last point of sale" at Meijer as follows:

                "We treat the last point of sale as the interior exit doors. There's two sets of
                exit doors. The inside ones are the ones that lead into the vestibule. There's two
                [electronic article surveillance] towers there. There are electronic article
                surveillance towers that scan for the product protection that we put on merchandise.
                That's what we treat as the last point of sale."

¶ 9            Monteer was working the afternoon of May 27, 2024. At approximately 1:24 p.m. that day, he watched on live video as Nidal Alzebdieh and a woman passed the last point of sale without paying for their merchandise. The female was Black, had medium or long black hair, and was of average build and height. Nidal was shorter, middle-aged, and bald. Monteer was in his office watching a live stream when he saw the individuals take items past the last point of sale without paying for them. Monteer then followed the individuals on an exterior camera so he could "get a shot of their vehicle and their license plate." After that, he reviewed the footage from the

time the couple came into the store until they left and confirmed that they obtained merchandise throughout the store and left without paying for any of it. He uploaded the recording to Meijer's cloud storage system and provided it to law enforcement. He identified the woman in the surveillance video as defendant.

¶ 10 The State tendered People's exhibit Nos. 1 through 4 to the trial court. They consisted of clips of what Monteer viewed on May 27, 2024, and provided to law enforcement. The exhibits were admitted into evidence without objection and published to the jury. The first two exhibits, which were each about one minute in length, showed Nidal and a woman walking throughout the store, picking up merchandise and placing it in a shopping cart. In People's exhibit No. 1, Nidal walked in front of the woman, while the woman pushed a cart full of items. In People's exhibit No. 2, Nidal pulled the cart out of the exit doors while the woman walked behind him, until she eventually reached the cart and started pushing it. People's exhibit No. 3, which was 30 seconds long, showed the two individuals leave through the exit doors of the store, with Nidal in front of the cart and the woman behind it, pushing it. People's exhibit No. 4, which was four minutes long, showed the Meijer parking lot. The woman began walking toward her vehicle and then unloaded items into it. Soon thereafter, Nidal arrived and helped unload items into the trunk. After all the items were loaded, Nidal got in the passenger's seat while the woman got in the driver's seat and drove away.

¶ 11 Monteer testified that he also observed defendant in the hallway of the courthouse and noticed that she had a distinct gait. The State tendered People's exhibit Nos. 5 and 6, which were screenshots from the security footage. People's exhibit No. 5 was a still image of defendant as she was leaving the store, and People's exhibit No. 6 was an image of the vehicle she and Nidal got into, showing the license plate. The State admitted the exhibits into evidence without objection

and published them to the jury.

¶ 12        Monteer notified law enforcement of the theft on June 1, 2024. Officer Brittany Evans of the Normal Police Department responded to the store. Monteer showed the video, consisting of People's exhibit Nos. 1 through 4, to Evans and provided her a copy of it. Monteer watched additional video showing defendant in the store the entire time, placing items into the shopping cart. He never saw defendant or Nidal go through a checkout line and pay for merchandise.

¶ 13        Monteer testified that no one stopped Nidal and defendant on May 27, 2024, because they were already almost out of the store when Monteer saw them. To the best of his knowledge, no Meijer employee interacted with defendant or Nidal on May 27, 2024. He did not remember talking to Officer Evans after June 1, 2024, but he said it was "possible." Monteer recommended that the police pursue theft charges only against Nidal. He acknowledged that only the state's attorney's office makes "charging decisions."

¶ 14                            B. Officer Evans

¶ 15        Officer Evans of the Normal Police Department testified that she was dispatched to Meijer in Normal at approximately 3:12 p.m. on June 1, 2024, for "[a] retail theft." Evans met with Monteer, who showed her the security footage from May 27, 2024, which consisted of six separate exhibits, which were People's exhibit Nos. 1 through 6.

¶ 16        In the surveillance videos, she observed "[a] male and female [leaving] past the cash registers with items that were not paid for, and they were taken out to a parking lot and left in a vehicle." The female was "a medium-build African-American." The male was shorter, bald, and "light skinned." Evans identified the woman in the security footage as defendant. Evans observed defendant in the hallway of the courthouse and noticed that she had "the same walk" and

the "same kind of gait" as the female in the Meijer footage.

¶ 17　　　According to Evans, the security footage captured the vehicle that defendant and Nidal entered, and the license plate number was visible in the screen shot, which was People's exhibit No. 6. Evans ran the license plate number through the Law Enforcement Agencies Data System and determined that the registered owners of the vehicle were Nidal and defendant. Evans also obtained the Illinois Secretary of State photo of defendant. Over defendant's objection, defendant's Illinois Secretary of State photo was admitted as People's exhibit No. 7 and shown to the jury.

¶ 18　　　Evans testified that she wrote a report about the theft on June 1, 2024, and wrote a supplemental report on June 12, 2024. On June 12, 2024, Monteer advised her that Meijer wanted to pursue charges only against Nidal, not defendant.

¶ 19　　　Evans went to Nidal's home on July 3, 2024, and arrested him. According to Evans, Nidal "denied the theft." When Evans asked Nidal who he was with on May 27, 2024, he said he was with "a girlfriend." Evans said someone else was in the apartment with Nidal at the time of the arrest, but Evans did not know who it was because she "did not go into the apartment." Another officer at the scene, Officer Melanie Crays, made contact with the woman. After arresting Nidal, Evans left Nidal's home. She did not ask about the female inside the apartment.

¶ 20　　　The State rested its case. Defendant moved for a directed verdict, which the trial court denied.

¶ 21　　　　　　　　　　　　　　　C. Nidal

¶ 22　　　Nidal testified for the defense. He admitted he was at Meijer on May 27, 2024, and charged with retail theft based on his actions that day. When Nidal was asked if he was familiar with what his wife looks like, he said, "Of course, yeah." However, when he was shown People's

exhibit No. 7, the Illinois Secretary of State photo of defendant, Nadal said he was "confused" about who was pictured. He then said he was "90 percent" sure it was his wife. When he was asked if he was "unsure," he said, "It looks like different, yeah." He agreed that he sometimes cannot recognize his wife in photographs because "everybody looks different in the pictures." He admitted he sometimes gets confused.

¶ 23    Nidal testified that he was with someone who was not his wife at Meijer on May 27, 2024. When Nidal was arrested, he told police that his girlfriend was with him at Meijer. At trial, Nidal said the woman he was with was "one of [his] girlfriends from Chicago," Illinois, whose name is "Nina." Nidal denied knowing Nina's last name. He said he met Nina in Chicago and she moved to Bloomington, Illinois, but then moved back to Chicago. He never told the police his girlfriend's first or last name or phone number. He said Nina "asked [him] for a ride to get some stuff from Meijer grocery." He said it was his girlfriend who decided not to pay for the items from Meijer but admitted that he pushed the shopping cart. He said Nina "told [him] to take [her] to Meijer. [He] took her to Meijer, and when she came to pay for it, she just kept going." He said he "didn't even know she wanted to do that." He believed she was more responsible for the theft than he was because he "didn't even know she [was] going to do that."

¶ 24                    D. Defendant

¶ 25    Defendant testified that she spoke with Evans when she arrested Nidal on July 3, 2024. Defendant said Evans asked her to step outside so she could see her face and another female officer said, "[N]o, it's not her." The officers then arrested Nidal. Nidal and defendant have been married for 30 years. Defendant said she has met "several" of Nidal's girlfriends, including Nina.

¶ 26    After July 3, 2024, defendant received a letter in the mail that said a warrant was out for her arrest, so she "went right then and there to the police station." Defendant denied being

at Meijer on May 27, 2024. She did not remember where she was that day but said she is "epileptic," so she is "usually in the house." She said she was "more than likely" at home that day. She said the police never asked if she was at Meijer on May 27, 2024, so she never said anything to them about where she was that day. Defendant said she and Nina thought they looked alike and used to say they were "sisters," but they are not related. The defense rested.

¶ 27                                E. Jury Instruction

¶ 28          At the State's request, and without objection, the trial court instructed the jury:

> "You have before you evidence that a law enforcement officer made an identification of the defendant from a video recording and photograph. It is for you to determine what weight, if any, should be given to that evidence. In determining the weight to be given to the evidence, you should not draw any inference from the fact that the witness is a law enforcement officer."

See Illinois Pattern Jury Instructions, Criminal, No. 3.15B (approved Jan. 26, 2018) (hereinafter IPI Criminal No. 3.15B).

¶ 29                    F. Verdict, Posttrial Motion, and Sentencing

¶ 30          The jury found defendant guilty. Defendant filed a motion for judgment of acquittal notwithstanding the verdict, or in the alternative, motion for new trial, arguing that she was not proven guilty beyond a reasonable doubt. The trial court denied the motion, stating:

> "The Court finds that there was ample evidence presented in this case to substantiate the finding of guilt by the jury, and while [Nidal] did identify that there was someone else, [Nidal] also could not identify his wife in a picture from the Secretary of State. [Nidal] has lots of doubts on many questions that he could not answer. And it is the jury's job to weigh the credibility and believability of the

witnesses. There was ample evidence of the video and two other witnesses to identify the defendant in this case. For all of those reasons, the Court is going to deny the motion."

¶ 31     The trial court sentenced defendant to 18 months of conditional discharge and ordered her to pay restitution of $193.70.

¶ 32     This appeal followed.

¶ 33                    II. ANALYSIS

¶ 34                    A. Sufficiency of the Evidence

¶ 35     Defendant first argues that the evidence was insufficient to prove her guilty of retail theft because she and Nidal testified that someone else was with him on May 27, 2024, at Meijer when the merchandise was stolen.

¶ 36     "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Bradford*, 2016 IL 118674, ¶ 12. As a reviewing court, we will not substitute our judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses. *Bradford*, 2016 IL 118674, ¶ 12. "Similarly, it is for the jury to resolve conflicts in the evidence." *People v. Collins*, 106 Ill. 2d 237, 262 (1985). On appeal from a criminal conviction, this court will not reverse a jury's guilty verdict unless the evidence is "so unreasonable, improbable or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Bradford*, 2016 IL 118674, ¶ 12.

¶ 37     A conviction may be proven "by circumstantial evidence as long as the elements of the crime have been proven beyond a reasonable doubt." (Internal quotation marks omitted.)

*People v. Smith*, 2014 IL App (1st) 123094, ¶ 13. "Circumstantial evidence is 'proof of facts and circumstances from which the trier of fact may infer other connected facts which reasonably and usually <mark>follow</mark>ing according to common experience.' " *People v. McPeak*, 399 Ill. App. 3d 799, 801 (2010) (quoting *People v. Stokes*, 95 Ill. App. 3d 62, 68 (1981)). It is the responsibility of the jury to draw reasonable inferences from basic facts to ultimate facts. *Smith*, 2014 IL App (1st) 123094, ¶ 13. In determining whether an inference is reasonable, the jury is not required to "look for all possible explanations consistent with innocence or 'be satisfied beyond a reasonable doubt as to each link in the chain of circumstances.' " *Smith*, 2014 IL App (1st) 123094, ¶ 13 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)). Rather, "it is sufficient if all the evidence, taken as a whole, satisfies the trier of fact that the defendant is guilty beyond a reasonable doubt." *Smith*, 2014 IL App (1st) 123094, ¶ 13.

¶ 38       Proof of any criminal offense requires evidence that (1) a crime has occurred and (2) the crime was committed by the person charged. *People v. Escort*, 2017 IL App (1st) 151247, ¶ 18. The State must prove beyond a reasonable doubt the identity of the individual who committed the charged offense. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995).

¶ 39       In this case, defendant does not dispute that a retail theft occurred. Rather, she argues that the State failed to prove beyond a reasonable doubt that she was one of the offenders. We disagree.

¶ 40       As the trial court explained in response to defendant's motion for acquittal or a new trial, the evidence against defendant at trial was "ample." There was no dispute that Nidal and a woman committed retail theft at Meijer on May 27, 2024, by taking merchandise and not paying for it. The only question was the identity of the woman who was with Nidal at the time. This was a question of credibility. On the one hand, the jury could choose to believe Nidal and defendant,

who claimed someone named "Nina," whose last name Nidal did not know and whose contact information they never gave to police, asked Nidal to take her to Meijer; however, unbeknownst to Nidal, her plan was to steal items, and Nina drove ~~his and~~ defendant's vehicle away after stealing items from Meijer. On the other hand, the jury could believe Monteer and Evans, as well as their own observations, in comparing the video and photos of the woman with defendant in person at trial and finding that defendant, Nidal's wife, was with him at Meijer, got into her car after stealing items from Meijer, and drove away. The jury was not required to believe the story that Nidal and defendant presented at trial.

¶ 41     In view of these principles, we conclude that there was sufficient evidence to support the jury's verdict. The resolution of defendant's guilt or innocence depended on the credibility and the weight to be given the witnesses' testimony, determinations that are exclusively within the province of the jury. See *Bradford*, 2016 IL 118674, ¶ 12. Additionally, it was for the jury to resolve conflicts in the testimony. See *Collins*, 106 Ill. 2d at 262. Here, the jury chose to believe Monteer and Evans, as well as their own eyes and observations, over the testimony of Nidal and defendant. After reviewing the record, we do not find that the jury's conclusion that the State proved beyond a reasonable doubt that defendant was the offender to be unreasonable.

¶ 42               B. Admissibility of Identification Testimony

¶ 43     Next, defendant argues that the trial court erred in allowing Monteer and Evans to testify that defendant was the woman in the surveillance video.

¶ 44     Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) provides that

> "in evaluating whether a lay witness may testify to an opinion about the identity of a perpetrator, the key factors are not whether the lay witness saw the charged offense take place but whether the testimony is rationally based on the witness's

own sensory perceptions and whether it would be helpful to the finder of fact."

*People v. Neal*, 2020 IL App (2d) 170356, ¶ 46.

"Rule 701 simply permits a non-eyewitness to offer testimony about identification if it would be helpful." *Neal*, 2020 IL App (2d) 170356, ¶ 47. Our supreme court explained:

> "Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *People v. Thompson*, 2016 IL 118667, ¶ 50.

¶ 45        Our supreme court also identified several factors to determine whether a lay witness's identification testimony is helpful. *Thompson*, 2016 IL 118667, ¶ 43. The first factor is the witness's general level of familiarity with the defendant's appearance. *Thompson*, 2016 IL 118667, ¶ 44. Having seen the defendant only once before may be enough. See *Thompson*, 2016 IL 118667, ¶ 44 (citing *United States v. Jackson*, 688 F.2d. 1121, 1123, 1125 (7th Cir. 1982)). Where familiarity is gained outside the courtroom and addresses the defendant's movements, posture, and expressions, it may provide evidence helpful to the jury. See *Thompson*, 2016 IL 118667, ¶ 45 (citing *State v. Barnes*, 212 P. 3d 1017, 1021, 1023 (Idaho Ct. App. 2009)).

¶ 46        The second factor is "the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or whether the defendant was dressed in a manner similar to the individual depicted." *Thompson*, 2016 IL 118667, ¶ 46. The third factor is "whether the defendant disguised his appearance at the time of the offense." *Thompson*, 2016 IL 118667,

¶ 47. Similarly, the "fourth relevant factor is whether the defendant had altered his appearance prior to trial." *Thompson*, 2016 IL 118667, ¶ 47. The fifth factor "is the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording." *Thompson*, 2016 IL 118667, ¶ 48.

¶ 47           "The existence of one or more of these factors indicates there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (Internal quotation marks omitted.) *Thompson*, 2016 IL 118667, ¶ 49. "Moreover, it has often been held that the extent of a witness's opportunity to observe the defendant goes to the weight to be given the testimony, not the admissibility." *Thompson*, 2016 IL 118667, ¶ 49. "A court reviews the trial court's decision to admit lay opinion identification testimony under an abuse of discretion standard." *Thompson*, 2016 IL 118667, ¶ 49. We apply a totality of the circumstances approach to determine if a witness's identification is helpful. *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 77 (citing *Thompson*, 2016 IL 118667, ¶ 51).

¶ 48           Our supreme court in *Thompson* further held "that when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury" to provide the defendant "an opportunity to explore the level of the witness's familiarity as well as any bias or prejudice." *Thompson*, 2016 IL 118667, ¶ 59. Additionally, to lessen any concerns regarding invading the province of the jury, the trial court should instruct the jury "that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed." *Thompson*, 2016 IL 118667, ¶ 59. Where the court does not engage in precautionary procedures required for law enforcement witnesses, the court errs in admitting the officer's testimony. See *Thompson*, 2016 IL 118667,

¶ 62. However, an error in admitting such testimony will be harmless where the evidence against the defendant is overwhelming. See *Thompson*, 2016 IL 118667, ¶¶ 67-68.

¶ 49    Defendant admits that she did not raise this issue below and has, therefore, forfeited it. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (stating that both a trial objection and a posttrial motion raising the issue are required for alleged errors that could have been raised during trial). However, she argues that we should review it for plain error or ineffective assistance of counsel.

¶ 50    1. *Plain Error*

¶ 51    The plain error doctrine allows reviewing courts to review a forfeited error when (1) the evidence in the case was so closely balanced that the jury's guilty verdict may have been the result of the error and not the evidence or (2) the error is so serious that the defendant was denied a substantial right, and thus, a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The first step in any plain error analysis is to determine if a clear or obvious error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Where there is no error, there can be no plain error. *People v. Scott*, 2020 IL App (2d) 180378, ¶ 14. "In plain-error review, the burden of persuasion rests with the defendant." *Thompson*, 238 Ill. 2d at 613.

¶ 52    Here, both Monteer and Evans had interactions with defendant that made their testimony helpful to the jury because they satisfied the first *Thompson* factor and had a "general level of familiarity with the defendant's appearance." See *Thompson*, 2016 IL 118667, ¶ 44. First, unlike the jury, who saw only clips of defendant moving through the store with her husband, Monteer watched the entire surveillance video from the time defendant entered the store until she left, giving him more knowledge than the jury about how defendant looked and moved. When a witness watches portions of a surveillance video that were unavailable to the jury, "the witness had advantages that the jury lacked." *People v. Banks*, 2021 IL App (4th) 180838-U, ¶ 6. Thus,

Monteer's identification testimony was helpful to the jury and was properly allowed. See *Banks*, 2021 IL App (4th) 180838-U, ¶ 6.

¶ 53          Second, Monteer and Evans both testified that they saw defendant outside the courtroom in the hallway and recognized her because of a specific gait she had, which they also had seen in the video. The jury would not have been as familiar with defendant's gait because they did not see defendant walking around the entire store, like Monteer, nor in the courthouse hallway, like both Monteer and Evans. The jury would have only seen her walk from her seat to the witness stand, which may not have provided the same opportunity to observe her gait. Because Monteer and Evans had this familiarity with defendant that the jury did not, their testimony would have been helpful, and it was not an abuse of discretion to admit it. This differentiates this case from *People v. Hibbler*, 2021 IL App (4th) 200022-U, which defendant urges us to rely on. In *Hibbler*, a detective's testimony identifying the defendant solely from video surveillance was improper because he was only familiar with the defendant from watching video recordings. *Hibbler*, 2021 IL App (4th) 200022-U, ¶ 99. Because Monteer and Evans had some additional familiarity with defendant than the detective in *Hibbler*, that case is distinguishable. Thus, the trial court did not err in allowing Monteer and Evans to identify defendant from the still photo taken from the video recording. Absent error, there was no plain error. See *Scott*, 2020 IL App (2d) 180378, ¶ 14 (explaining that when there is no error, there can be no plain error).

¶ 54          Defendant argues that our decision in *People v. Sykes*, 2012 IL App (4th) 111110, supports reversal in this case. However, *Sykes* is also distinguishable. In *Sykes*, a witness for the State narrated a video as it was shown to the jury. Defendant argued that the narration "invaded the province of the jury because it allowed him to give [a] lay opinion on the ultimate issue where he was in no better position to view the video than the jury." *Sykes*, 2012 IL App (4th) 111110,

¶ 33. *Sykes* is not controlling because the witness in that case testified extensively about what "he recalled observing on the original surveillance video" and provided a "narration of the original surveillance video" to the jury. *Sykes*, 2012 IL App (4th) 111110, ¶¶ 6, 9. We ruled that this testimony was an invasion of the province of the jury because the witness told the jury what they were seeing. Here, no witness narrated the Meijer surveillance video showing defendant and Nidal. Instead, Evans and Monteer simply looked at a still image from the surveillance video and identified the subject as defendant. Because, as explained above, Monteer and Evans had additional knowledge of defendant by seeing defendant walk in the halls of the courthouse, unlike the State's witness in *Sykes*, their testimony was helpful and did not invade the province of the jury.

¶ 55        Defendant, however, argues that we must reverse and remand because the trial court did not conduct a *Thompson* hearing before allowing Evans and Monteer to testify. We disagree because no one requested such a hearing. Absent a request from counsel for such an inquiry, no inquiry is necessary. See *People v. Jones*, 2025 IL App (1st) 230635, ¶¶ 7-13 (holding a *Thompson* hearing where defense counsel filed a motion to bar identification testimony of witnesses); see also *Thompson*, 2016 IL 118667, ¶¶ 5, 59 (holding the trial court should have held a hearing where the defendant filed a motion *in limine* regarding the admissibility of lay opinion identification testimony). Here, defense counsel did not file a motion to bar the testimony of Evans or Monteer or request a *Thompson* inquiry prior to their testimony; thus, it was not error for the court not to hold such a hearing before allowing the testimony of Evans and Monteer. Because defense counsel did not request such an inquiry, we have no reason to reverse and remand on that basis.

¶ 56        Defendant also argues that reversal is required because "Evans' testimony was particularly prejudicial because of her role as a police officer" and alleges that the State invaded

the province of the jury through her testimony. However, the trial court provided the jury IPI Criminal No. 3.15B, which instructed jurors that it was for them to determine "what weight, if any," to give to an officer's identification and that they "should not draw any inference from the fact that the witness is a law enforcement officer." See IPI Criminal No. 3.15B.

¶ 57 "A jury is presumed to follow a trial court's jury instructions." *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 81. Thus, we must presume that the jury followed the instruction and did not draw any inference from Officer Evans's position as a law enforcement officer.

¶ 58 Based on the circumstances of this case, we find no clear or obvious error occurred; thus, there can be no plain error. See *Scott*, 20202 IL App (2d) 180378, ¶ 14.

¶ 59                                2. *Ineffective Assistance*

¶ 60 The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. The guarantee of effective assistance applies at all critical stages of criminal proceedings. *People v. Williams*, 358 Ill. App. 3d 1098, 1104 (2005). When reviewing a claim of ineffective assistance of counsel, this court applies the two-part framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a defendant must demonstrate both deficiency and prejudice. *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 61 To establish deficient performance, the defendant must show trial counsel's performance fell below an objective standard of reasonableness. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. The reviewing court strongly presumes counsel's decisions were the result of sound trial strategy. *Strickland*, 466 U.S. at 689.

¶ 62 To establish prejudice, the defendant must show a reasonable probability that counsel's deficient performance affected the outcome of the trial. See *People v. Billups*, 2016 IL

App (1st) 134006, ¶ 16. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. A failure to establish either deficiency or prejudice is fatal to the ineffective assistance claim. *Hibbler*, 2019 IL App (4th) 160897, ¶ 88. We review *de novo* a claim of ineffective assistance of counsel raised for the first time on appeal. *Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 63        Because we found above that it was not error for the trial court to admit the testimony of Monteer and Evans, we likewise find that counsel was not deficient for failing to object to the admission of their testimony because there was no basis to exclude it. See *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24 ("[C]ounsel cannot be ineffective for failing to object if there was no error to object to."). If lay witness identification testimony is helpful and "not clearly or obviously inadmissible under Rule 701, 'it was within the wide range of reasonable professional assistance' to refrain from objecting to [the] testimony." *Banks*, 2021 IL App (4th) 180838-U, ¶ 62 (quoting *Strickland*, 466 U.S. at 689). Given the helpfulness of the lay identification testimony of Evans and Monteer, an objection would not have been meritorious. See *Banks*, 2021 IL App (4th) 180838-U, ¶ 6. Because an objection to the testimony of Evans and Monteer would not have been successful, defendant cannot establish deficient performance. Absent deficient performance, defendant cannot establish ineffective assistance of counsel. See *Hibbler*, 2019 IL App (4th) 160897, ¶ 88 (stating that a failure to establish either deficient performance or prejudice is fatal to a claim of ineffective assistance). Thus, defendant's ineffective assistance claim fails.

¶ 64                              III. CONCLUSION

¶ 65        For the reasons stated, we affirm the trial court's judgment.

¶ 66        Affirmed.